**Exhibit 6**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES G. MILES and

JUDY MILES, h/w,

               Plaintiffs,

                         CIVIL ACTION

       -vs-                 NO. 19-1551-CFK

RAVIN CROSSBOWS, RAVID

CROSSBOWS, LLC, VELOCITY OUTDOOR,

INC., A-1 ARCHERY, INC., and A1

ARCHERY SUPPLY,

               Defendants.

_____/

PAGE 1 to 137

    The Deposition of GEORGE M. SAUNDERS, JR.,

    Taken at 151 South Old Woodward Avenue, Suite 200,

    Birmingham, Michigan,

    Commencing at 8:58 a.m.

    Tuesday, February 4, 2020

    Before Cynthia Ann Chyla, RPR, CSR, 0092.

## Page 2

1  APPEARANCES:
2  MR. JOSEPH MONACO
3  Kane & Silverman
4  2401 Pennsylvania Avenue, Suite 1A-5
5  Philadelphia, Pennsylvania 19130
6  215-599-6544
7     Appearing for Plaintiffs.
8
9  MR. BARRY B. SUTTON  P48761
10 Clark Hill, PLC
11 151 S. Old Woodward Avenue, Suite 200
12 Birmingham, Michigan  48009
13 313-965-8577
14 Bsutton@clarkhill.com
15    Appearing for Defendant Ravin Crossbows.
16
17 MR. TIMOTHY MULLIN
18 Zarwin, Baum, DeVito, Kaplan, Schaer,
19   Toddy, P.C.
20 2005 Market Street, 16th Floor
21 Philadelphia, Pennsylvania 19103
22 215-569-2800
23 Tpmullin@zarwin.com
24    Appearing, via telephone, for Defendant A-1 Archery.
25          *  *  *  *  *

## Page 3

1           TABLE OF CONTENTS
2  Witness                              Page
3  GEORGE M. SAUNDERS, JR.
4  EXAMINATION BY MR. MONACO              4
5
6           INDEX TO EXHIBITS
7        (Exhibits attached to transcript)
8  Exhibit                              Page
9  DEPOSITION SAUNDERS EXHIBIT 1          20
10 Affidavit of Jeffrey Mathews
11 DEPOSITION SAUNDERS EXHIBIT 2          76
12 Drawing
13 DEPOSITION SAUNDERS EXHIBIT 3          78
14 Page Labeled sear Roller to Sear Force
15 (Equilibrium after connecting to the string.)
16 DEPOSITION SAUNDERS EXHIBIT 4          78
17 Page Labeled sear Roller to Ser Force
18 (Equilibrium after cocking.)
19 DEPOSITION SAUNDERS EXHIBIT 5          94
20 Crossbow target
21 DEPOSITION SAUNDERS EXHIBIT 6          94
22 Deer target
23
24
25

## Page 4

1            Birmingham, Michigan
2            Tuesday, February 4, 2020
3            About 8:58 a.m.
4            GEORGE M. SAUNDERS, JR.,
5  having first been duly sworn, was examined and testified
6  on her oath as follows:
7  EXAMINATION BY MR. MONACO:
8  Q.  Can you state your full name and date of birth for the
9      record.
10 A.  Sure.  George M. Saunders, Jr.  November 1st, 1972.
11 Q.  Mr. Saunders, as you know my name is Joseph Monaco and I
12     represent Charles Miles and his wife in the claims they
13     brought against Ravin Crossbows and a couple of other
14     Defendants regarding the issue he had with a Ravin R15
15     crossbow.
16 A.  Okay.
17 Q.  And it's my understanding that you've been down this
18     road before, so I will dispense with giving you our
19     standard instructions except to the extent if I ask you
20     a question that you don't understand, let me know and
21     I'll be more than happy to rephrase it so you do fully
22     understand it.  And let's try not to speak over each
23     other so her job is easier.  Fair enough?
24 A.  Fair enough.
25 Q.  Okay.  What is your profession?

## Page 5

1  A.  I'm a mechanical engineer.
2  Q.  And how long have you been employed as a mechanical
3      engineer?
4  A.  Since 1995.
5  Q.  Okay.  Who do you currently work for?
6  A.  A company called Beacon Scientific, LLC.
7  Q.  And how many employees does Beacon Scientific have,
8      approximately?
9  A.  Three people work there.  One would be considered an
10     employee.
11 Q.  And who works there excluding the employee?
12 A.  Myself and Dr. Jason Kiddy, K-I-D D-Y.
13 Q.  And is Mr. Kiddy also an engineer?
14 A.  Dr. Kiddy is a mechanical engineer as well.
15 Q.  And who is the employee?
16 A.  His name is Tony Bocchichio, B-O-C-C-H-I-C-H-I-O.
17 Q.  Thank you.
18 A.  Maybe.
19 Q.  And what are his duties?
20 A.  He's also a mechanical engineer.
21 Q.  Who owns Beacon Scientific?
22 A.  Myself and Dr. Kiddy.
23 Q.  Okay.  And how long has Beacon Scientific been in
24     existence, approximately?
25 A.  Beacon Scientific was started in July of '17.  It was a

1    preceding company that I owned alone that started in
2    2012 also operating under the trade name Beacon
3    Scientific.
4  Q.  Fair enough.  And what type of matters do you handle at
5    Beacon Scientific?
6  A.  We're all mechanical engineers and generally speaking
7    anything you might assign a mechanical engineer to
8    that's within our experience we're happy to look at.
9    And we would be the first to tell you when a case is not
10   something within our skill set.
11 Q.  Do you do consulting work only for litigation matters?
12 A.  The bulk of my work at this point is litigation matters.
13   There is some design work but that is the exception as
14   opposed to the rule.
15 Q.  How about Dr. Kiddy?
16 A.  He does some intellectual property work which I guess
17   would still be litigation but it's a different realm
18   than what we're here for.
19 Q.  Fair enough.  In your CV you talk about the fact that
20   you have a powered access license?
21 A.  Yes.
22 Q.  What is that exactly?
23 A.  If I said aerial work platform would that ring a bell
24   for you?
25 Q.  No.

1  A.  Boom lift or scissor lift, does that ring a bell?
2  Q.  That rings a bell.
3      Now, it's my understanding -- I apologize.  My
4    understanding you have a hunting license or -- go ahead.
5  A.  No.
6  Q.  You're a hunting educator or instructor?
7  A.  Yes, I'm a certified crossbow instructor.
8  Q.  Okay.  How long have you held that certification?
9  A.  I'd have to go back and look at the certificate, but it
10   was I'd say between 2014 and 2016.
11 Q.  Okay.  And why did you obtain that certification?
12 A.  I was starting to get a few crossbow cases and wanted to
13   seek out training to see how other folks were going to
14   be trained to utilize these so I have some insight into
15   that.
16 Q.  Do you hunt personally?
17 A.  I do, not often but I do.
18 Q.  Do you crossbow hunt?
19 A.  Yes.  The last two times I've been were crossbow hunts.
20 Q.  And when were the last two times, meaning within the
21   last year or two or before that?
22 A.  No.  The last 2 years I haven't been able to go.  It's
23   been scheduled and the weather hasn't cooperated or life
24   hasn't cooperated.
25 Q.  Fair enough.  When did you personally first operate a

1    crossbow, just a ballpark?
2  A.  I was probably, a quote-unquote, kid.  Sometime -- you
3    know, quite a long time ago.
4  Q.  Fair enough.  Do you own crossbows yourself?
5  A.  Yeah.  I mean that's -- within the company there are
6    several dozen that are in storage, so if I own them --
7    if I own the company I guess I own the crossbows.
8    They're all received as typically exemplars to be
9    utilized and then the case is resolved and nobody has
10   asked for them back.
11 Q.  Fair enough.  Besides crossbows that you use as exemplar
12   for a case do you personally own crossbows?
13 A.  No.
14 Q.  Do you personally own any firearms such as a rifle or a
15   shotgun or anything like that?
16 A.  I've got a shotgun, a muzzle loader and a few pistols.
17 Q.  Fair enough.  Besides the Ravin crossbow cases have you
18   ever handled other crossbow matters?
19 A.  Yes.
20 Q.  How many, just a ballpark, different cases?
21 A.  I have no idea.
22 Q.  More or less than 20?
23 A.  Probably, yes.
24 Q.  More than 20?
25 A.  Probably.

1  Q.  Regarding crossbows?
2  A.  Yes.
3  Q.  Besides Ravin crossbows?
4  A.  Besides Ravin crossbows.
5  Q.  And did any of those cases involve misfires?
6      MR. SUTTON:  Objection; form.
7  A.  I think there were -- I think there were a few that
8    there was a claim made with regard to some sort of a
9    misfire, if you will.
10 BY MR. MONACO:
11 Q.  Fair enough.  How did you get involved in this case, and
12   not just specific to Miles but the Ravin cases in
13   general?
14 A.  The very first involvement I had with Ravin was not
15   related to litigation.  I was asked to do an evaluation
16   of their products and that was in 2017 I think, December
17   of '17, maybe.  I may have the timing wrong on that.
18   It's in the record in this matter.
19 Q.  I understand.
20 A.  And then some -- maybe a year or so later I was then
21   contacted about litigation by Mr. Sutton.
22 Q.  Who asked for your involvement back in 2017?
23 A.  I was ultimately contacted by Mr. Sutton, but the
24   request as I understand it came from Ravin, but they
25   routed it through their attorney for various legal

## Page 10

1  reasons.
2  Q.  Is that Mr. Schwappach?
3  A.  As who the person from -- I don't know who the person
4     from Ravin was.
5  Q.  Have you had other cases with Mr. Sutton besides the
6     Ravin cases?
7  A.  Yes.
8  Q.  Ballpark as to how many cases you've had with
9     Mr. Sutton?
10 A.  It's not something that I track.  I've worked with
11    Mr. Sutton for a number of years.
12 Q.  More or less than 20 cases?
13 A.  Probably more than 20.
14 Q.  More or less than 50?
15 A.  Possibly.  Again, it's not something I track so it's not
16    a number I'm going to be able to give you.
17 Q.  And that's just with Mr. Sutton himself as opposed to
18    his firm?
19 A.  I was thinking more generally in terms of the firm.  So
20    if you want to narrow it down to the individual I just
21    don't know.
22 Q.  Let's back up.
23     Specifically with Mr. Sutton more or less than
24    20 cases?
25 A.  I could imagine it being more than 20, but, it's --

## Page 11

1  again, I don't know the answer.  It's not something that
2  I track.
3  Q.  How about just specifically in regards to Mr. Sutton,
4     more or less than 50 cases?
5  A.  We're getting into the realm where I just don't know the
6     answer.
7  Q.  And how about the firm Clark Hill?
8  A.  I think I already gave you the answer in excess of 50
9     but it's not a number I track.  So without going and
10    doing the research I can't give you a number.
11 Q.  Have you worked with other lawyers at Clark Hill besides
12    Mr. Sutton?
13 A.  Yes.
14 Q.  And who is that?
15 A.  It was Mr. Sutton, Mr. Karfis, Mr. Agosta.  There was a
16    gentleman named Bartoni, although he was typically
17    working under either Mr. Sutton or Mr. Karfis.  There
18    have been a few other lawyers I interacted with in a
19    supporting role, if you will.
20 Q.  Fair enough.  And besides the Ravin cases have you had
21    any crossbow cases with Mr. Sutton?
22 A.  Yes, one or two.
23 Q.  And besides the Ravin cases and the one or two other
24    cases that you mentioned regarding Mr. Sutton have you
25    had crossbow cases with other lawyers from Clark Hill?

## Page 12

1  A.  No.
2  Q.  Now, it's my understanding that in regards to the Ravin
3     crossbows that you have done some computer modeling;
4     correct?
5  A.  Yes.
6  Q.  Which software did you use for that?
7  A.  It's two different but related software packages.  One
8     would be SolidWorks Premium from 2016.
9  Q.  SolidWorks Premium?
10 A.  And the other would be Simulation Premium also from
11    2016.
12 Q.  And when you put the date on it is that because there
13    are more recent updates?
14 A.  Yes.
15 Q.  And do you have the recent updates?
16 A.  No.  You basically have to re-buy the software every
17    year and that software package was about $18,000.  So
18    2016 will work for now.
19 Q.  I understand.  Software is expensive.
20     When you were taking classes for your
21    undergraduate degree or degrees and your Masters Degree
22    did you have classes on using computer software?
23 A.  Yes.
24 Q.  And did you have classes on using SolidWorks?
25 A.  No.  The software package that was in use at that time

## Page 13

1  was called Ideas and there was some FORTRAN-based
2  packages as well which is more of a programming language
3  than a software package.
4  Q.  Fair enough.  What training do you have using
5     SolidWorks?
6  A.  It's -- I've got a lot of experience using various CAD
7     programs and SolidWorks is almost exclusively taking my
8     experience and knowledge in CAD programs and using that
9     one.
10 Q.  Fair enough.  And how about regards to Simulated?
11 A.  Similar, they're sister packages, the same response for
12    both.
13 Q.  Fair enough.  Would you agree that the use of computer
14    modeling is just one tool that should be used when
15    you're evaluating a product?
16 A.  It's one tool that can be used when evaluating a
17    product.
18 Q.  And you would agree that field testing is a tool that
19    should be used in evaluating a product?
20 A.  It's another approach to evaluating it, yes.
21 Q.  Would you agree that the results from computer modeling
22    don't always match the results from field testing?
23 A.  That's a possibility.
24 Q.  In your experience how frequently can that happen?
25 A.  I'm not sure I could put a frequency on it.  The only

## Page 14

1  thing I would say is that field testing can be done in
2  such a manner that it's done that it's not
3  representative of a given situation, so both have to be
4  carefully constructed to yield meaningful results.
5  Q.  You would agree that before a product is put out in the
6  market that they should do field testing and computer
7  modeling?
8  A.  Not necessarily.  You know, each company chooses the
9  path in which they elect to go down.  It's very clear to
10  me that there's been a lot of work done on a computer
11  when designing this product you couldn't design it
12  without a computer, and then my understanding is there's
13  been a lot of testing done as well.  I understand on the
14  order of 150,000 shots of this bow were completed during
15  the development phases.
16  Q.  But my question was more in general and maybe break it
17  down a little bit.
18      Do you agree that before a product is put out
19  in the market it should undergo a certain level of field
20  testing?
21  A.  It should be evaluated.  Now, depending on the product
22  since you're asking the question in a general sense, you
23  know, shooting inside of a building versus outside of a
24  building isn't going to make any difference at all.
25  Simply because some evaluation was done inside doesn't

## Page 15

1  mean that that's not applicable to using that product
2  outside, so to speak.
3  Q.  I apologize.  I think I'm using the wrong terminology.
4      To me field testing is just real life testing
5  as opposed to computer modeling.  Does that help clarify
6  what I'm trying to ask you?
7  A.  Well, I mean, you know, I wouldn't put the word field in
8  front of it.  Field implies to me that I'm going to take
9  this thing out in a field.  Let's talk about a crossbow
10  for instance.  I'm going take the thing and go hunting.
11  You know, relative to taking that product and putting it
12  on a bench or hand-holding it and shooting it 150,000
13  times I would rely on the 150,000 shots more than I
14  would two or three shots you may do in the field.  And
15  obviously two or three shots is --
16  Q.  I wasn't trying to restrict it to just a field, I just
17  was restricting it to actually testing the product
18  itself as opposed to just computer modeling.  What
19  would you call testing the product itself in the real
20  world?
21  A.  Just product testing.
22  Q.  Fair enough.
23  A.  I wouldn't put a descriptor on it.  There's what we're
24  doing, testing.
25  Q.  Fair enough.  And just to backtrack to my earlier

## Page 16

1  question that you would agree that computer modeling
2  results don't always match product testing results?
3  A.  Correct.
4      MR. SUTTON:  Objection; form.
5  A.  And product testing results often or sometimes cannot
6  match simulation results.  I mean, for instance, if
7  we're going to design a product, say Marge Rover, good
8  luck with that one without doing all computer modeling.
9  BY MR. MONACO:
10  Q.  I agree.  I agree.
11      Now, it's my understanding that you did
12  computer modeling in this case; correct?
13  A.  I did what would be characterized as a simulation, so
14  basically it's a physics-based simulation.  I told the
15  computer what the parts look like, I told the computer
16  what the parts were made from and I gave it a force
17  input at one part, and the computer computed the forces
18  that are transmitted to all of the other parts.
19      And, so, it can account for the behavior of,
20  for instance, the sear pivots on a pivot point, it will
21  account for that behavior from a physics and engineering
22  mechanics standpoint, unlike, say, finite element
23  modeling or that kind of thing.  They're not -- they're
24  different things.  I don't know if you understand the
25  difference between the two.

## Page 17

1  Q.  I do not.  What's finite element testing?
2  A.  Finite element modeling is when I'm basically -- I have
3  a model of a part.  I apply loads and I'm trying to
4  figure out what the stress is within that part; so, in
5  other words, how does it bend, how does it flex, that
6  kind of thing.
7      That's not the kind of modeling that I did in
8  this case.  The modeling that I did in this case assumes
9  that the bodies are rigid and the model is called a rigid
10  body analysis.  And, again, the computer understands
11  what the materials are, the shape of the materials are,
12  what the friction properties is between the mating
13  components and then, again, it's given a force input at
14  one location and calculates the reaction forces through
15  the remainder of the assembly.
16  Q.  What was the name of the testing that you did not do?
17  A.  Finite element modeling?  There was not -- there's not a
18  question of parts bending in this particular case,
19  although I did run one finite element modeling in this
20  case to be responsive to an issue that Dr. Batzer
21  attempted to put forward.
22  Q.  And what issue was that?
23  A.  He talked about the parts flexing and the loads being
24  extreme, and, so, I ran one model on the clasp to
25  demonstrate under full load it flexes a little less than

## Page 18

1  2-thousandths of an inch, and the fact that the material
2  stresses are merely nonexistent.
3  Q.  So the computer testing that you did in this case I
4  understand was down under two scenarios, I believe.
5  You did one scenario where you try to input the
6  specifications from the drawings and then I believe the
7  other scenario is where you tried to incorporate some
8  manufacturing tolerances?
9  A.  I did more than those two, but those two were done, one
10  at nominal dimensions so what is the middle of the
11  tolerance range.  And then I looked at it from a
12  mechanics standpoint and shifted the tolerances to get
13  to what I thought was a worst case scenario with regard
14  to this intermediate release.
15  Q.  And it's my understanding that you did that modeling in
16  regards to the recall type of issues, correct, where you
17  have the initial hang fire followed by the misfire
18  during reloading or re-nocking of the arrow?
19  A.  Correct.  Both those analyses were investigating the
20  condition under which the product was recalled.
21  Q.  And is it correct that you could not simulate or
22  duplicate the loading of the arrow in an intermediate
23  position?
24  A.  On physical hardware I was unable to create a hang fire
25  condition despite spending about 2 days of effort doing

## Page 19

1  that.  And at some point at the rates in my industry it
2  just doesn't make sense for me to be doing that kind of
3  work.  And Ravin internally has since done that kind of
4  work because it's done from a dollar and cents
5  standpoint done much more efficiently in that
6  environment than I could do it.
7  Q.  I understand.  It's fair to say from your perspective or
8  from the perspective you doing it personally that you
9  were not able through the computer modeling to duplicate
10  the recall type of hang fire and misfire event?
11  A.  No, that's not an accurate statement.
12  Q.  You were able to recreate it?
13  A.  Yes.  I was unable to do it physically but I was able to
14  do it via modeling.
15  Q.  Okay.  And did the modeling show that the recall type of
16  hang fire and misfire can take place?
17  A.  It shows that in the two models that we discussed, one
18  that I ran at nominal dimensions and one I ran at what I
19  consider to be worst case dimensions, I could simulate
20  the -- yeah, model the recall condition in the shifted
21  model or the worst case scenario, and in the nominal
22  dimensions the incident won't occur.  The fact is the
23  sear when you pull the trigger automatically resets
24  itself as soon as you let go of the trigger.
25  Q.  And did you attempt to do any computer modeling

## Page 20

1  regarding misfires where the trigger was not pulled at
2  any point along the sequence of events?
3  A.  There's no modeling to be done there.  It basically is a
4  physical impossibility.  You're going to have to pull
5  the trigger in order to release the sear.  I know that
6  Dr. Batzer speculated that that's possible but he's done
7  no analysis whatsoever.  It's pure speculation.  And I'm
8  telling you right here as a very experienced mechanical
9  engineer with an intimate understanding of this
10  mechanism you will never get this to release without
11  pulling the trigger.
12  Q.  You agree, though, that there are claims by users that
13  they have had misfires without the trigger being pulled?
14  A.  I'm not aware of all claims that exist but I know that
15  there are people that are referring to various claims
16  that might be the instance.  But I'm telling you right
17  now a user's perspective needs to be balanced with what
18  the physical hardware is actually capable of doing.
19        MR. MONACO:  Can we mark this as Saunders 1.
20        DEPOSITION SAUNDERS EXHIBIT 1
21        Affidavit of Jeffrey Mathews
22        WAS MARKED BY THE REPORTER
23        FOR IDENTIFICATION.
24  BY MR. MONACO:
25  Q.  Mr. Saunders, I marked an affidavit from a Jeff Mathews.

## Page 21

1  Have you seen this before?
2        MR. SUTTON:  Objection to the
3  characterization.
4        Go ahead.
5  A.  Yeah, I think this came a day or two ago.  Let me just
6  read it through to refresh my memory.
7  BY MR. MONACO:
8  Q.  Sure.
9        (Document reviewed by the witness)
10  A.  Okay.  I've reviewed the document Exhibit 1.
11  Q.  So according to Mr. Mathews' sworn testimony in this
12  affidavit he had a misfire without pulling the trigger;
13  correct?
14  A.  That's what this document says, yes.
15  Q.  He indicates that he cocked the crossbow correct?
16  A.  Yes, that's what it says.
17  Q.  And that he loaded the arrow?
18        MR. SUTTON:  Objection.  The document
19  obviously speaks for itself.
20        MR. MONACO:  I understand.  I just want to
21  make sure we're on the same page.
22  A.  All it says is that "While using the crossbow a short
23  time afterwards that summer it fired without me pulling
24  the trigger."
25  BY MR. MONACO:

1  Q. The next sentence says: "The crossbow fired when I
2     moved the safety to the fire position after I cocked the
3     crossbow and loaded the arrow"?
4  A. Correct.
5  Q. So he cocked the crossbow; correct? Correct?
6  A. I mean it says -- we can read this as much as you want
7     but that's what it says.
8  Q. And then he loaded the arrow according to Mr. Mathews;
9     correct?
10 A. Yes.
11 Q. And then he says that when he moved the safety to the
12    fire position the crossbow fired?
13 A. That's what he says, yes.
14 Q. And he says he did that without ever pulling the
15    trigger; correct?
16 A. Again, that's what he says.
17 Q. So you think he's mistaken, Mr. Mathews?
18 A. This is a wonderful document but he hasn't been
19    cross-examined or thoroughly examined on these points.
20 Q. I didn't ask you that. Do you think he's mistaken? I
21    mean, sorry, I apologize, I thought you were done.
22         MR. SUTTON: I think he was trying to answer.
23         MR. MONACO: I apologize.
24 A. He hasn't been thoroughly examined on these points and
25    the physical evidence, to my knowledge, anyway, has not

1     been fully evaluated, and this scenario doesn't make
2     sense. When you look at how this mechanism works there
3     is no action of moving the safety that will ever move
4     the sear. They're independent parts that are not bonded
5     or connected to one another and if I move the safety it
6     has no impact on the sear.
7  BY MR. MONACO:
8  Q. Do you know how many people have claimed the misfire
9     occurred without their ever pulling the trigger in the
10    sequence of events?
11 A. No. Again, people can claim whatever they want to, but
12    until that person and that product are evaluated it
13    really doesn't rise to the level of being viable
14    evidence as far as I'm concerned.
15 Q. So you don't think that real world events by product
16    users are relevant?
17 A. That's not what I said at all. What I'm saying is that
18    those physical products and there's individuals need to
19    be examined in detail, because sometimes in events
20    users' perspectives are not accurate, and I'm not going
21    to accept, for instance, this gentleman's sworn
22    statement. I'm never going to accept that as being what
23    actually happened, because this is this gentleman's
24    perspective. And he may be wholly mistaken, and we have
25    no way to evaluate that without looking at the product,

1     without actually cross-examining on this to really
2     understand what it is that he's attempting to prove.
3  Q. So you believe that any individual who claims that they
4     had a misfire with a Ravin crossbow without a trigger
5     pull is not to be believed?
6  A. That's not what I've said. It needs to be evaluated.
7     That bow needs to be physically evaluated, not only for
8     its function but maybe disassembled and looked at to see
9     if there's some issue with its internal components. But
10    I will not accept it based on the statement that's in
11    Exhibit 1, for instance, or as an example, combined with
12    my intimate understanding about how this mechanism
13    works. These two scenarios don't make any sense without
14    doing an evaluation of the product and without doing an
15    evaluation of the person and really diving into the
16    statements they are making.
17 Q. Do you know if Ravin evaluated any crossbows where there
18    was a claim that the crossbow misfired without a pulling
19    of the trigger?
20 A. There's been something in the record about various
21    products being returned. I know that the products that
22    I looked at in 2017 were all returned products, but
23    beyond those two insights I have no idea what they ever
24    did.
25 Q. What is your definition of misuse?

1         MR. SUTTON: Objection to form.
2  A. Well, if you look, if you look at this specific case --
3  BY MR. MONACO:
4  Q. I'm asking in general.
5  A. Well, I'm giving you a specific example in an attempt to
6     answer your question.
7         If you look at this specific case, this
8     product comes with a detailed set of instructions which
9     tell you precisely how to use this product. And if you
10    deviate from that in a way that they specifically
11    warned, for instance, that would lead to injury then I
12    would consider that a misuse.
13 Q. Can you just give me a general definition of misuse in
14    regards to use of any product?
15 A. The using it in an unintended manner.
16 Q. And does that have to be intentional by the user?
17        MR. SUTTON: Objection to form.
18 A. Yeah, I'm not sure I'm following your question.
19 BY MR. MONACO:
20 Q. Sure. Does your definition of misuse of a product
21    include or require that someone intentionally misused a
22    product?
23 A. No. Basically if something has an intended use and
24    you've been specifically instructed on that intended use
25    and you use it in some different manner, you are now

1    misusing the product.
2  Q.  Does the user of the product have to have knowledge of
3    the misuse?
4          MR. SUTTON:  Objection to form.
5  A.  Again, I'm just not following your question beyond the
6    answers I've already given on this.
7  BY MR. MONACO:
8  Q.  Does the product user have to be aware that he is not
9    following the instructions regarding the product?
10          MR. SUTTON:  Objection to form.
11  A.  There's some subtlety you're looking for here I'm not
12    following.  I mean, if a user receives a product and is
13    given a set of instructions that define the intended use
14    of that product and they deviate from that intended use
15    then I would consider that misuse.
16  BY MR. MONACO:
17  Q.  And does the deviation have to be intentional?
18          MR. SUTTON:  Asked and answered.
19  A.  Yeah, I mean, I'm -- the answer I've given you I think
20    fully answers your question and there's obviously some
21    nugget you're looking for that I am just not
22    comprehending.
23  BY MR. MONACO:
24  Q.  What I'm trying to get at is when you say that somebody
25    is misusing a product, is there some level of -- does

1    there have to be some level of culpability on their
2    part?
3  A.  Yeah.  If they were given instructions about how to
4    specifically use something and they use it in a
5    different manner then that's going to be a misuse of the
6    product.
7  Q.  So in your definition of a misuse the person has to be
8    aware that they're doing something wrong?
9  A.  Again, I don't -- I mean, they may have chosen not to
10    read the instructions, for instance.  That in and of
11    itself is a misuse.  And any deviation they make from
12    those instructions would also be a misuse.
13  Q.  Now, it's my understanding that you personally have not
14    been able to load an arrow in an intermediate position;
15    correct?
16  A.  Correct.  I have a full understand of the mechanics what
17    would be required to cause that to happen and I have
18    been unable to do it physically.
19  Q.  And how many times have you attempted to do it?
20  A.  It was about 2 days worth of effort, roughly 8 hours day
21    each, some by myself and some by Dr. Kiddy.
22  Q.  And did you ever speak with Craig Yehle about how to get
23    an arrow in this intermediate position?
24  A.  No, I've had no direct contact with him other than I
25    think we did cross paths at a trade show and there was

1    an exchange of pleasantries but no substantive
2    discussion.
3  Q.  It's your understanding that Mr. Yehle was able to place
4    an arrow in the intermediate position?
5  A.  I think with considerable effort Mr. Yehle and
6    Mr. Guthrie were ultimately able to make this happen.
7  Q.  Did you meet with Mr. Guthrie to have him show you how
8    to place the crossbow -- I'm sorry, place the arrow in
9    the intermediate position?
10  A.  No, I have not met with him for that purpose.
11  Q.  Why not?
12  A.  Because it's not necessary.  I understand what's
13    occurring here.  I wasn't able to do it physically but I
14    was able to satisfy myself with simulation about what
15    the mechanics were that made this happen.
16  Q.  So you don't believe it would have been helpful to you
17    to have been able to place an arrow in the intermediate
18    position to see how one of the crossbows would react to
19    that?
20  A.  At this point it would be nice to have but I think I
21    have a full understanding of the mechanics that are
22    involved in that particular situation and I'm able to
23    analyze, for instance, the reaction forces on each
24    individual component in that scenario, including making
25    a reasonable engineering estimate of the force required

1    to reset the safety in that instance.
2  Q.  And why is it that you can't replicate -- I'm sorry, not
3    replicate.  I apologize.  Why is it you can't get the
4    arrow in the intermediate position?
5  A.  Because the bow and nock and arrow --
6          THE WITNESS:  Nock is N-O-C-K.
7  A.  -- are specific designed not to allow that to occur.
8  BY MR. MONACO:
9  Q.  But it's your opinion that if a user allows that to
10    occur that they're misusing the crossbow?
11  A.  Yes, because the user is very specifically instructed to
12    fully nock the arrow and is instructed as to what
13    feedback they're supposed to receive when they've
14    actually fully nocked it, so yes.
15  Q.  But you as an engineer, you're not able to load the
16    arrow a bit short to get it into this intermediate
17    position; correct?
18  A.  Correct, because there's -- it's designed specifically
19    to not allow that to happen.  You're basically working
20    against a force associated with the interference fit
21    between the nock and the string it's basically working
22    against you and you're looking to end up on this balance
23    point.
24          And what I've shown is that the range in which
25    this occurs is on the order of the thickness of two and

1    a half pieces of paper. And all the while, you know,
2    it's -- you and I pushing on the end of an arrow that's
3    20-something inches away from where this is occurring
4    and it's just a -- it's an improbable situation. It's
5    -- I don't think you're going to get there.
6    Q. And even though it's an improbable situation, yet you
7    still consider that when it occurs by user to be misuse
8    of the product?
9    A. Yes, because those things are totally unrelated. The
10    user is instructed to fully nock the arrow which
11    requires that arrow to be pushed over that interference
12    fit and to be fully clasped onto the string, and it's
13    made crystal-clear in the instructions that's how it's
14    done. I believe each person or each deposition that
15    I've read on this specific topic has fully understood
16    that that's what they were supposed to do, including
17    testifying about tactile feedback, that they can feel
18    the exchange in force --
19    Q. Sure.
20    A. -- and expecting an audible feedback, hearing the click,
21    and there is a visual way you can look at the bow and
22    you can see it's either nocked or not. So the user has
23    everything they need to do that properly.
24    Q. But you just testified that the difference in distance
25    between an intermediate nocked arrow and a fully nocked

1    arrow is two pieces of paper?
2    A. No, that's not what I said. The range over which this
3    intermediate condition can occur is only two and a half
4    pieces of paper in terms of the axial movement of the
5    arrow. Fully nocked and not fully nocked is about an
6    eighth of an inch if I remember the dimensions
7    correctly. It's a pretty substantial difference.
8    Q. Where did you get that number, an eighth of the inch?
9    A. When you physically look at the nock, it's the distance
10    between the minimum throat distance and the nock -- let
11    me finds a picture.
12    Q. I understand.
13        If you kind of reference an old-fashioned
14    skeleton key hole, you have the circle at the top and
15    then you've got the triangle part at the bottom;
16    correct?
17    A. If you look --
18    Q. Tell us what page you're on.
19    A. It's a section of the analysis. This is one of the
20    figures that appears in my appendix to my report except
21    blown up much bigger so you can see it.
22    Q. Sure.
23    A. There's a minimum throat distance --
24    Q. Correct.
25    A. -- the distance between these two points. So What I'm

1    describing is this distance here is roughly an eighth of
2    am inch, and 2-thousandths of an inch reference that I'm
3    making is referencing this minimum throat a
4    2-thousandths of an inch difference where this hang-up
5    can occur, this intermediate position can occur.
6    Q. And how is the user supposed to detect that?
7    A. They're supposed to fully nock the arrow onto the string
8    getting tactile and audible feedback.
9    Q. So you're saying that this intermediate nocking of the
10    arrow has to occur without the nock initially being
11    fully loaded?
12    A. Correct.
13    Q. So you don't believe that you can fully nock the arrow
14    and then it releases on its own?
15    A. No. It's -- it's called an interference fit. So if you
16    can imagine, I've got the round bow string and I'm
17    pushing that minimum throat distance and the nock up
18    onto it. And it's roughly speaking when the minimum
19    throat distance passes the maximum diameter it's going
20    to snap into place, and when it snaps into place it's
21    going to stay there.
22    Q. If the arrow and the nock are not fully loaded, meaning
23    that circle or part doesn't go over the bow string, then
24    it's going to be you say about an eighth of an inch
25    short?

1    A. It's -- I'm giving you a very round number.
2    Q. Sure.
3    A. I could give you a very precise number if you'd like.
4    Q. That's fine. It's approximately eighth of an inch?
5    A. It's in the ballpark of an eighth of an inch.
6    Q. Does the arrow and the bow string make a click if the
7    arrow is loaded in the intermediate position?
8    A. Generally no. The click or the audible feedback or the
9    tactile feedback that you're getting is associated with
10    the minimum nock or the minimum throat distance passing
11    the maximum diameter on the string. That snap action
12    you get when you pass that point is the audible
13    feedback.
14    Q. You just qualified something by saying generally. I'll
15    ask that question again.
16        Can a click occur when the arrow is loaded in
17    the intermediate position?
18    A. You could bang the nock into the trigger mechanism or
19    something of that nature but that will sound and feel
20    entirely different than the snap action associated with
21    clipping the nock onto the string.
22    Q. And how much of a difference of a click is it?
23    A. I can just tell you the character will be different.
24    It's not something I've gone and quantified. It could
25    be quantified but I haven't.

1    Q. So you believe that a Ravin crossbow user who just
2        purchased the crossbow and is using it for the very
3        first time should know the difference between the click
4        you just described by hitting something else with the
5        nock versus the nock going over the bow string?
6    A. Absolutely. The click that I just described, you know,
7        hitting the trigger mechanism with the nock would be
8        unintentional and not the action of loading the bow or
9        loading the arrow onto the string.
10            These things happen in concert, so, in other
11        words I'm holding the arrow, I'm pushing it onto the
12        string, the snap action occurs, so simultaneously I'm
13        getting tactile feedback, I'm getting audible feedback,
14        I have the opportunity to get visual feedback if I seek
15        it. But those actions all happen simultaneously, and if
16        you don't get them all you haven't completed the
17        process.
18    Q. So you could have two clicks when you're loading the
19        arrow?
20    A. If you rattle around the trigger you can have multiple
21        clicks, but the sound character from contacting the
22        housing with the nock versus clipping over the bow
23        string are unique and different.
24            And, again, the one that we're really
25        interested in associated with the tactile and the

1        audible feedback are coupled so they happen as a result
2        of one another.
3    Q. Have you ever recorded the different sounding clicks?
4    A. We did do sound pressure level testing on the nocking of
5        an arrow and I believe the results of some testing done
6        on safety clicking on and off.
7    Q. Has that been produced?
8    A. I think it was. It may not have been in this case, but
9        the work has definitely been done.
10    Q. And who did the work, you or ...?
11    A. I think the sound pressure measurements were made by
12        Dr. Kiddy. I suspect it was for the Cordy matter. All
13        of the work was done at my direction but he may have
14        been the one that physically did it.
15    Q. I understand.
16            What is your definition of a crossbow hang
17        fire?
18    A. I don't necessarily have a definition. I don't think it
19        was a term I used and if I did it's inadvertent. The
20        term I've used in my report was a partial discharge of
21        the bow.
22    Q. I'm just trying to get everybody on the same page
23        because if you read the different depositions, people
24        are all over the place. Agreed?
25    A. I've tried to be consistent in the language I used in my

1        report. I'm pretty sure partial discharge is the one
2        that I settled on.
3    Q. So your term that you use when you pull the trigger and
4        the crossbow doesn't fire is partial discharge?
5    A. Well, that's a different discussion. There's several
6        reasons that that could occur.
7    Q. I'm not asking for the reason, I'm asking what you call
8        it. How about -- let me back up.
9            In the context of the recall events when
10        somebody intermediately loads the arrow and then the
11        trigger is pulled and the crossbow doesn't fire, what do
12        you call that?
13    A. The terminology that I've attempted to use and hopefully
14        been consistent is partial discharge.
15    Q. And why do you say it's a partial discharge? Emphasis
16        on partial?
17    A. Had to have some term so I didn't have to write out and
18        describe in three sentences every time I tried to talk
19        about the issue. So that's the term that I like to use.
20        Nothing, nothing more nefarious than that. To make the
21        writing concise I selected that term to describe that
22        scenario.
23    Q. I understand. But it's your understanding that there is
24        some level of discharging that's occurring?
25    A. The behavior within the trigger mechanism changes if the

1        user does not put the thing back on safe as they're
2        instructed to do.
3    Q. What is your definition of a crossbow misfire?
4    A. I mean as a very generic term it would be discharging
5        when it's not intended to discharge.
6    Q. And would it be fair to say when there's a discharge --
7        I apologize.
8            Would you say that a misfire occurs when
9        there's a discharge without a simultaneous pulling of
10        the trigger?
11    A. All -- I would leave it completely generic, that it's,
12        it's not an intentional discharge and I wouldn't
13        associate it with -- I'm using it as a very generic term
14        and not specific to this case.
15    Q. I understand.
16            Would you agree that if everything else
17        remains a constant that a product should be made as safe
18        as possible?
19    A. I think the standard is reasonably safe, so I'm good
20        with the term reasonably safe.
21    Q. I didn't ask you that. My question was: Do you believe
22        if everything else remains constant, meaning cost and
23        the utility of the product, that the product should be
24        made as safe as possible?
25            MR. SUTTON: Objection to form.

## Page 38

1   A.  You can't -- you can't isolate those factors.  They all
2      play into the design of a product.  You know, at no
3      point can I ever allow infinite cost as a product
4      manufacturer to make the product as safe as possible.
5      That's not possible.  We would still being using sticks
6      and sitting around fires if that was the case.
7  BY MR. MONACO:
8   Q.  That wasn't my question.  My question is:  If everything
9      else remains constant including the cost and the utility
10     of the product do you agree that the product should be
11     made as safe as possible?
12        MR. SUTTON:  Asked and answered.
13  A.  Well, then your hypothetical question is unanswerable
14     because as an engineer I understand that all of those
15     things are interplay and can never be held constant as
16     you're suggesting in the hypothetical so as a result I
17     can't answer your hypothetical.
18  BY MR. MONACO:
19   Q.  You're aware that in July of 2017 Ravin started to
20     redesign some of the parts in the trigger firing
21     mechanism?
22  A.  Yes, I understand they started redesigning some
23     components based on some misuses they were seeing in the
24     field of using non-Ravin nocks with their product.
25   Q.  The redesigns that were started in July of 2017, they

## Page 39

1     eventually made it into production; correct?
2  A.  Yes.
3   Q.  And do you think that the end of line, for lack of a
4     better term, R9 and R15 crossbows that had the
5     redesigned parts, do you think that those R9 and R15
6     crossbows cost more to manufacture because of the
7     redesign?
8        MR. SUTTON:  Objection to form.
9  A.  I mean, sort of by definition they would have cost more
10     to manufacture because you spent the time and effort to
11     go through a second round of design and development.  In
12     the end the final products, the final parts probably
13     don't cost anymore, but there is the sunk cost
14     associated with developing those products or those parts
15     again.
16  BY MR. MONACO:
17   Q.  I understand.
18  A.  So with regard to the final retail price and production
19     it's a much better question for Ravin, but from a
20     30,000-foot view by definition they had to cost more if
21     you take the overall development of the cost of the
22     product.
23   Q.  Do you know how much the development costs were for the
24     redesign of the parts we've been talking about by Ravin?
25  A.  No, I don't.  Much better question for Ravin.

## Page 40

1        MR. SUTTON:  Giving you some leeway obviously
2     here, Joe, but the trigger redesign was initiated after
3     your client's injury, so ....
4        MR. MONACO:  My client was injured in August
5     and the redesign was in July; right?
6        MR. SUTTON:  I thought your client was injured
7     in June.
8        MR. MONACO:  That's all right.  You can't keep
9     track of all these cases; right?
10  BY MR. MONACO:
11   Q.  And let me ask you this, Mr. Saunders.  Do you agree
12     that the redesigned trigger mechanism parts did not
13     diminish the functioning of the crossbows?
14  A.  No, I think the crossbows still functioned -- I haven't
15     done any evaluation to speak of on the new designed
16     crossbows because they're not at issue but I would
17     anticipate that they didn't impact the function of the
18     product.
19   Q.  That was my question, that the redesign did not diminish
20     the function?
21  A.  One would expect not.
22   Q.  Let me ask you this.  Have you been involved in any
23     cases regarding the Ravin crossbow that has the
24     redesigned parts?
25  A.  No, not that I'm aware of.

## Page 41

1   Q.  Are you involved in any Ravin crossbow cases besides
2     those involving the R9 or R15 crossbow?
3  A.  I believe all of the cases that I've got at this point
4     are R9 or R15 crossbows.
5   Q.  Fair enough.  Would you agree because you're not able to
6     put the crossbow -- I apologize.
7        Would you agree that because you're not able
8     to load an arrow in the intermediate position that you
9     cannot then in regards to the product testing determine
10     whether that has any effect on the movement of the
11     safety?
12  A.  No.
13        MR. SUTTON:  Object to form.
14  A.  I disagree with that.
15  BY MR. MONACO:
16   Q.  You're not able to do that, correct, because you're not
17     able to put the arrow in intermediate position?
18  A.  No, I did.  I was able to simulate that condition and
19     then evaluate the -- evaluate from an engineering
20     standpoint all aspects of that bow including the
21     function of the safety.
22   Q.  I meant besides computer modeling, I meant actually
23     holding the Ravin crossbow because you're not able to
24     put an arrow in intermediate position you're not able to
25     determine whether that can lead to some issue with the

## Page 42

1 movement of the safety?
2 MR. SUTTON: Objection to form.
3 A. No, I also disagree with that. I've seen video of a bow
4 that was in the intermediate position. The Guthrie
5 video you mentioned before we got on the deposition
6 shows that scenario. And then maybe last week or the
7 week before I was present when Dr. Batzer attempted to
8 do his demonstration. While I disagreed entirely with
9 the methodology that was there, even in that instance we
10 were able to put the bow back on safe.
11 BY MR. MONACO:
12 Q. But initially it was difficult to move the safety back
13 to safe; correct?
14 A. No, actually, that was a rather bad day for Dr. Batzer,
15 because when he attempted to make the measurement it was
16 within less than a tenth of a pound of the exact same
17 measurement of a bow that was, quote-unquote,
18 functioning normally, so there was no change in behavior
19 that was quantifiable at all.
20 Q. It was observable, though, that the safety initially
21 could -- that the safety initially could be put back in
22 the full safe position?
23 A. No. It went to full safe when the force was applied to
24 move it towards safety.
25 Q. Well, the second try, though?

## Page 43

1 A. Yeah. I mean, I believe he did flip it to an
2 intermediate position, but there was no force applied to
3 do that. When he actually put force on the safety it
4 reset at exactly the same load that a, quote-unquote,
5 normally functioning crossbow did and did exactly what
6 the instructions told you that you should do.
7 Q. But you need to use some force to put the safety in an
8 intermediate position as well; correct? It just doesn't
9 move there by itself?
10 A. I'm just not following your question.
11 Q. Sure.
12 A. I mean --
13 Q. Let me back up.
14 Do you agree that the safety can be placed in
15 an intermediate position?
16 A. Yes. I mean, if you barely try and move it, which would
17 not be consistent with even normal use of the safety,
18 you're able to move it such that you can see a white dot
19 and a red dot in the window of the safety which I
20 believe is what Dr. Batzer has termed as an intermediate
21 position.
22 But the reality is when you actually apply a
23 force to that, which is what you need to do to move it
24 from safe to fire, some intentional force, Dr. Batzer
25 has now quantified that that force is exactly the same

## Page 44

1 as a, quote-unquote, normally functioning crossbow and
2 goes into the full safety position.
3 MR. SUTTON: I just object to the form of the
4 last question. He answered and I didn't want to cut him
5 off.
6 MR. MONACO: No problem.
7 BY MR. MONACO:
8 Q. Have you had an opportunity to read Dr. Batzer's
9 deposition in this case?
10 A. Yes.
11 Q. What is your definition of reckless?
12 A. Undertaking an action that you ultimately know has the
13 potential to lead to serious injury and doing it anyway.
14 Q. So your definition of reckless requires intent by the
15 product user?
16 MR. SUTTON: Objection to form.
17 A. I guess to some degree reckless in my mind implies that
18 you know you're doing something and you do it anyway.
19 Q. What is the purpose of the anti-dry fire mechanism?
20 A. Exactly as the name implies, anti-dry fire. It's trying
21 to prevent you from doing what's called a dry fire of
22 the bow, and a dry fire is defined as basically firing
23 the bow or a bow without an arrow in place, because the
24 arrow actually absorbs a lot of energy and if you fire
25 without that arrow present you have the potential of

## Page 45

1 destroying the bow.
2 Q. Should any anti-dry fire mechanism prevent a discharge
3 if the arrow is not loaded fully?
4 MR. SUTTON: Objection to form.
5 A. Yeah. I mean that's sort of by definition loaded fully
6 there won't be dry fire. Loaded in any other position,
7 there's a potential for the mechanics of a dry fire to
8 be present.
9 BY MR. MONACO:
10 Q. Should the anti-dry fire mechanism for the Ravin
11 crossbows prevent a discharge when the arrow is loaded
12 in this intermediate position?
13 A. I mean it does as far as I'm aware. This intermediate
14 position that we're discussing doesn't allow the bow to
15 fire.
16 Q. Should the anti-dry fire mechanism prevent these Ravin
17 crossbows from firing while somebody is re-nocking the
18 arrow?
19 A. The anti-dry fire mechanism shouldn't be active in that
20 situation until they're inactively nocking.
21 Instructions will tell you to put it back on safe in
22 which case the anti-dry fire doesn't do anything until
23 it reengages the lower surface of the nock as a result.
24 Q. But my question is: Should the anti-dry fire mechanism
25 prevent the crossbow from firing without a simultaneous

## Page 46

1    pulling of the trigger?
2         MR. SUTTON: Objection; form.
3    A.   I'm just -- I'm trying to think through your question
4         and I can't --
5    BY MR. MONACO:
6    Q.   Let me ask it another way.
7    A.   Yeah, please do.
8    Q.   You would agree that an anti-dry fire mechanism should
9         prevent an arrow from firing while the arrow is being
10        reloaded?
11   A.   Again, the anti-dry fire system isn't active in that
12        scenario and never should be active in that scenario.
13        The only time the anti-dry fire comes into play is when
14        there's a trigger pull and there is a physical block for
15        movement of the trigger. In all instances when you're
16        using the bow as intended in a situation where you're
17        loading it, the only thing that should be occurring as
18        the nock moves the anti-dry fire lever is rotating
19        counterclockwise.
20   Q.   Let me ask you this. If someone loads the arrow in the
21        intermediate position, they pull the trigger, it doesn't
22        fire and then they forget to move the safety, they leave
23        it in the fire position, then they go to re-nock the
24        arrow. Shouldn't the anti-dry fire mechanism prevent a
25        discharge at that point as well?

## Page 47

1         MR. SUTTON: Objection to form.
2    A.   No. There's a -- basically you've got a population of
3         bows here that will automatically -- the sear will
4         automatically reset, so you can do whatever you want
5         with the anti-dry fire mechanism with the hypothetical
6         question or the scenario you laid out here.
7              Then there's going to be a population in the
8         intermediate position where you're going to move the
9         anti-dry fire lever and it's going to allow that release
10        to occur. But, again, that's a patent misuse of the
11        product because in the event that the trigger pull
12        occurs, the bow doesn't discharge, the user is very
13        clearly instructed to move it back into safe, and if you
14        do that the scenario you've laid out can't occur.
15   BY MR. MONACO:
16   Q.   I didn't ask you that. I asked you if the anti-dry fire
17        mechanism should prevent a discharge if the user
18        inadvertently or intentionally fails to put the safety
19        back in a safe position?
20        MR. SUTTON: Objection to form; asked and
21        answered.
22             You may answer again.
23   A.   Yeah, I mean the anti-dry fire mechanism acts on the
24        trigger. So when you say the anti-dry fire mechanism
25        doing something, it's there to block the trigger from

## Page 48

1    moving, that's its purpose in life.
2    BY MR. MONACO:
3    Q.   Correct.
4    A.   And, so, I've answered your question and I've also
5         explained how it works and how it should be reset. So
6         beyond what I've already said, I don't know what else to
7         give you as an answer to that question.
8    Q.   So it's your position that the anti-dry fire mechanism
9         should not be designed to prevent a discharge when
10        someone is re-nocking an arrow?
11        MR. SUTTON: Objection to form.
12   A.   You know, I'm going to have to ask you to reask that
13        question. You've got a bunch of different negatives in
14        there and I couldn't keep track of the total count.
15   BY MR. MONACO:
16   Q.   Sure. So it's your position that the anti-dry fire
17        mechanism shouldn't be designed so it can prevent a
18        discharge while re-nocking an arrow without a
19        simultaneous pulling of the trigger?
20        MR. SUTTON: Objection to form.
21   A.   The purpose of the anti-dry fire mechanism on this
22        particular bow is to block the safety -- sorry, to block
23        the sear. There are other designs of crossbows that
24        prevent the safety from moving. I mean it just -- there
25        are multiple ways to come at this. This particular bow,

## Page 49

1    the anti-dry fire mechanism blocks movement of the
2    trigger.
3    BY MR. MONACO:
4    Q.   Is there any redundancy in this design to prevent
5         misfires?
6         MR. SUTTON: Objection to form.
7    A.   Yeah. I mean, there are multiple things in this design
8         that prevent misfires.
9    BY MR. MONACO:
10   Q.   And can you outline those for me?
11   A.   Sure. One is that the safety when on serves as a
12        physical block to movement of the sear, and the sear was
13        ultimately the component that the trigger pushes on to
14        allow the release.
15             The other mechanism -- another mechanism
16        that's in place is the anti-dry fire lever is
17        spring-loaded in such a way as it remains in front of
18        the trigger until the arrow is fully nocked onto the
19        string.
20             And then there is the interaction of the nock
21        and the string which is a third safety mechanism that's
22        in place to prevent that bow from discharging.
23   Q.   How does that work? How does that prevent it? What
24        interaction are you referencing?
25   A.   Except for a small tolerance that's already been

## Page 50

1 acknowledged by Ravin, it won't allow the bow to
2 discharge until the nock is fully seated onto the arrow.
3 Q. We know that there's an exception to that?
4 A. There is a very fine exception to --
5     MR. SUTTON: Objection to form.
6 A. There is a very fine exception to that which Ravin has
7 already acknowledged with a recall. It is also a
8 situation that in my opinion that is highly improbable
9 and in my case impossible to recreate.
10 BY MR. MONACO:
11 Q. Have there been recall-type misfires with orange nocks?
12 A. I think there is at least one claim now that I've read
13 that says that. When that case becomes active I'll go
14 analyze it, but at this point I haven't analyzed that
15 case to see whether it's even possible.
16 Q. How did the orange nock address this recall misfire
17 issue?
18 A. It changes the interaction between the nock and the ADF
19 and when movement of the ADF occurs by shortening the
20 overall length of the nock and moving the contact, when
21 that action takes place in the nocking cycle.
22 Q. And how does the movement of the ADF differ between the
23 white nock and the orange nock?
24 A. Again, I haven't gone and analyzed to the match rear end
25 as I have done on the white nock. I've just looked at

## Page 51

1 the difference between the white nock and the orange
2 nock and have a general understanding of what they've
3 done, and that is they have shortened up the nock and
4 they changed when the interaction takes place. Again, I
5 haven't gone to the level that I've gone with the white
6 nock.
7 Q. Sure. Have you analyzed the difference regarding the
8 ADF in the original design versus the redesign?
9 A. No, it's not a part that's applicable to this case or
10 any case that I've got going so it's not one I have
11 analyzed in detail.
12     MR. SUTTON: When you have a good time for a
13 break.
14     MR. MONACO: Sure. If you want, we can take a
15 break.
16     MR. SUTTON: Fabulous.
17     (A short recess was taken.)
18 BY MR. MONACO:
19 Q. You agree that the original design of the ADF basically
20 has a blunt chisel-type end?
21 A. I would describe it as serrated. There are small steps
22 on the end of the rectangular column, for lack of a
23 better way to describe it.
24 Q. And you agree that the new design of the ADF, that the
25 ADF is a bit shorter and it has a center point like an

## Page 52

1 arrow?
2 A. I haven't studied how the dimension's changed, only the
3 overall form, and the form on the new one, it comes to a
4 radiused point along with some other changes within the
5 mechanism. Again, I know they exist but I haven't
6 studied them in terms of how the parts interact.
7 Q. Sure. So you haven't done any computer modeling
8 regarding the new designs?
9 A. No. There's a considerable amount of effort that goes
10 into putting that together and getting it working and
11 because it's not involved in this case or any other case
12 I haven't.
13 Q. Why would you say it's not involved in this case?
14 Because an alternate design that makes a product safe is
15 always an issue in these cases.
16     MR. SUTTON: Objection to form.
17 A. I don't understand that your experts actually suggest
18 that as an alternative design nor do I think he's done
19 an analysis to say that it is and on your part it's a
20 subsequent remedial measure.
21 BY MR. MONACO:
22 Q. Not under Pennsylvania law. Pennsylvania law is just
23 whether an alternate design was feasible at the time the
24 product was manufactured. That's all. There's no
25 negligence involved or anything like that.

## Page 53

1     During Dr. Batzer's deposition on January 7,
2 2020 we marked some photographs of what I believe is
3 supposed to represent the sear and the sear roller.
4 A. Correct.
5     MR. SUTTON: Actually, just for the record, I
6 believe that's just a -- the circled part is just a
7 measuring tool.
8     MR. MONACO: Correct, correct, just represent.
9 I didn't say actually was.
10     MR. SUTTON: Just wanted to be clear.
11     MR. MONACO: But I was going to get to that.
12     MR. SUTTON: I think there was a distinction
13 that you may find out, so ....
14     MR. MONACO: Sure.
15 BY MR. MONACO:
16 Q. There are five photographs that had been previously
17 marked. Have you seen these before?
18 A. Yes.
19 Q. All right. So if we look at Photograph Number 4, so
20 this shows a portion of the sear; correct?
21 A. Yes.
22 Q. All right. And then it has --
23 A. A dowel --
24 Q. -- like a representative -- excuse me?
25 A. A dowel pin.

1  Q.  A dowel pin basically representing the location of the
2      sear pin; correct?
3          MR. SUTTON:  Just so we're clear on the record
4      these are the PDF copies of Exhibits 1 through 5 of
5      Mr. Batzer's deposition.
6          MR. MONACO:  Correct.
7          MR. SUTTON:  Just so we're not confused about
8      Deposition Exhibit 1 that was marked already today.
9          MR. MONACO:  Correct.  I thought I was clear.
10     But that's all right, Barry.
11         MR. SUTTON:  Just want to make sure.
12 BY MR. MONACO:
13 Q.  Now, do you agree that this photograph shows a portion
14     of the originally designed sear?
15 A.  It's -- I can't tell you that.  Basically it is
16     something I recognize as being a sear that appears to be
17     of a similar design as to what we're talking about in
18     this case, but to verify for you that this is the
19     originally designed part I can't do that because I don't
20     think Dr. Batzer's made those measure.  In fact, he said
21     he hadn't made any measurements on this other than the
22     analysis in these photographs he's talking about.
23 Q.  Well, the sear -- I apologize.
24 A.  No worries.
25         Just to close it off, you asked me a very

1      specific question and the answer to that question is I
2      don't know and Batzer also couldn't confirm it during
3      his deposition.  So generally it is something that's of
4      the form of the sear part manufactured by Ravin but to
5      say it was the original design versus some other
6      subsequent design I can't make that distinction for you.
7  Q.  Well, Dr. Batzer testified that this sear came from a
8      Ravin crossbow that had the original design; correct?
9  A.  He said it came from a Ravin crossbow which he received
10     in an entirely disassembled state.  Therefore, he has no
11     idea where these parts actually came from because he
12     didn't buy it himself, he didn't take it apart himself,
13     he received a bagful of parts.  And he didn't make any
14     individual measurements of this part to determine that
15     it actually complies with any given design made by
16     Ravin.
17 Q.  He said it matched the drawing that he had of the
18     original sear design?
19 A.  I think if you go look at his testimony, particularly
20     when I looked at his file I didn't see any evidence that
21     he made detailed measurements of this.  He specifically
22     said he hadn't taken it to an optical comparator or
23     anything of that nature.  He has no idea what this
24     specific part is other than it certainly looks like that
25     draw.

1  Q.  So you think that when he's given a crossbow and he's
2      given a crossbow where the trigger firing mechanism was
3      opened that he has an inability to say whether those
4      parts came from that crossbow?
5          MR. SUTTON:  Objection to form.
6  A.  He's willing to raise his right hand and swear to things
7      that I don't think he actually has basis to testify to.
8      There is a method by which you could verify what this
9      part is, and that is to go make measurements of the
10     actual physical part back to what the specific drawing
11     communicates.  That process has not occurred and that
12     specifically what Dr. Batzer testified has not occurred.
13         So at this point he's received a bag of parts
14     which he has made an assumption relates back to a
15     specific crossbow, and it is an assumption.  I wouldn't
16     be willing to raise my right hand and swear based on an
17     assumption.
18 BY MR. MONACO:
19 Q.  Let me ask you this.  Let's assume that this sear shown
20     in Exhibit Number 4 from Dr. Batzer's deposition is
21     actually an originally designed sear from an R9/R15
22     crossbow.  Do you understand that?
23 A.  Okay.
24 Q.  And then Mr. -- I'm sorry, and then Dr. Batzer received
25     or put a pin in that's in the same diameter as the sear

1      roller; correct?
2  A.  It's the -- based on what it says it's a .188, 188-
3      thousandths of an inch in diameter which is the maximum
4      diameter the sear roller is specified to be on the
5      drawings.  So he's put in a gauge pin or a dowel pin of
6      that diameter to take this photograph.
7  Q.  Correct.  Now, with my initial assumption that this is
8      actually a sear that came from a Ravin R9/R15 crossbow,
9      would you agree that the placement of the sear roller
10     results in an unstable condition?
11         MR. SUTTON:  Objection; form.
12 A.  No.  There are several problems with the analysis
13     presented by Dr. Batzer, most obvious of which are this
14     pin -- these parts, this sear roller and the sear are
15     spring-loaded to remain engaged with one another in the
16     mechanism, and in this picture I can detect a gap at the
17     two points of contact, at least based on the photograph
18     that's been provided here, meaning that this analysis
19     that's been done doesn't reflect the actual parts in an
20     actual assembly.
21         Not only that, there's error associated with
22     the methodology with which this analysis was done.  This
23     was, as I understand it, Dr. Batzer taking a picture
24     with a camera, putting it on a computer, drawing circles
25     over top of these components and then drawing the

## Page 58

1     various lines to be representative of their interaction,
2     and these are very tightly controlled and tightly
3     manufactured. In fact, the tolerance associated with
4     the sear roller is a half of 1-thousandths or
5     .0005 inches. That's the tolerance range on this part.
6          So to suggest that I can take a handheld
7     camera, take a picture, draw some lines on it in a
8     program and do some meaningful analysis is completely
9     bogus. There are methodologies to do what he's doing
10    here. This does not represent those methodologies.
11    BY MR. MONACO:
12    Q.   You think the sear roller can sit deeper in this sear
13         cavity?
14    A.   I think this illustration isn't accurate of the actual
15         parts that exist. There are much better methodologies
16         by which to do this analysis and in addition to that the
17         engagement that's shown here is typical of just about
18         every trigger that exists on this planet. It's a
19         trigger, it's intended to release, hold it but release
20         something when you pull the trigger, and none of them
21         have, you know, massive features that require, you know,
22         a 1-inch trigger pull to get the thing to release. The
23         customer is never going to accept that and that's not
24         how triggers are designed. This trigger is designed
25         just like about every other trigger on the face of this

## Page 59

1     planet.
2     Q.   You would agree that there are documented incidents of
3          people having a discharge while re-nocking an arrow?
4     A.   There are reported incidents of that, yes.
5     Q.   And do you agree that they have actually happened?
6     A.   I agree that they have been reported. It goes back to
7          the same rationale that I would use in responding to
8          Exhibit 1. Folks have made these claims. Some of these
9          have been evaluated to date. In fact, everyone that I
10         have evaluated to date if the bow is safe to fire, I
11         have fired it 20 times and I have never had one that
12         didn't function properly. And I've done that
13         repeatedly.
14              So I understand that people are making these
15         claims but they aren't substantiated as far as I'm
16         concerned in terms of considering it evidence and being
17         accurate. Until the bow is evaluated, until the person
18         is cross-examined on what their claim is it's just
19         hearsay.
20    Q.   When you have tested these bows you have not tested them
21         with an arrow that has been loaded in the intermediate
22         position; correct?
23    A.   No, I've tested them in accordance with the instructions
24         and the intended use.
25    Q.   I didn't ask you that. I asked you it is correct that

## Page 60

1     you have not tested these crossbows with an intermediate
2     placement of an arrow?
3          MR. SUTTON: He answered that question
4     directly.
5          You may tell him again.
6     A.   Same answer, no, I have not. I have tested these bows
7     based on their intended function, and every time they
8     have always worked the way they are intended to
9     function.
10    BY MR. MONACO:
11    Q.   Just because a bow fires as intended 20 times, that
12         doesn't mean on the 21st time that the arrow can't be
13         placed in an intermediate position; correct?
14    A.   In the intermediate position is a misuse of the product.
15    Q.   I didn't ask you that.
16    A.   You asked me the question.
17         MR. SUTTON: Please don't cut him off.
18         MR. MONACO: If he answers the question --
19         MR. SUTTON: You can't cut him off. He is
20    answering the question. You don't like the answers, I
21    understand you don't like the answers, but you keep
22    cutting him off. He has a right to be heard. He can
23    testify.
24         Go ahead Mr. Saunders.
25    A.   I totally lost the question.

## Page 61

1     BY MR. MONACO:
2     Q.   I'll ask it again.
3          Do you agree that you can shoot one of these
4     crossbows 20 times without any incident and then on the
5     21st time the arrow could wind up in the intermediate
6     loaded position?
7     A.   No. The intermediate loaded position requires the user
8     not properly nock the arrow with the tactile and the
9     audible feedback that exists, and that's not consistent
10    with the instructions. So if you're going to have me
11    fire it on the 21st time I can guarantee you with very
12    high degree of certainty it is going to behave exactly
13    the way it did on the first 20 shots.
14    Q.   That's not my question. My question is: You could fire
15         these crossbows 20 times, a particular Ravin crossbow 20
16         times and then on the next attempt, the 21st attempt
17         that arrow can, whether by mistake, by intent, by
18         oversight, can then wind up in the intermediate
19         position?
20         MR. SUTTON: Objection; form.
21    A.   And it's consistent with what I put in my report. I
22    think that is highly improbable. Again, I spent 2 days
23    attempting to do this and I think Ravin has spent much
24    more time than that, ultimately was able to demonstrate
25    it but it's not something that's probable.

## Page 62

1  BY MR. MONACO:
2  Q.  But it is something that happens and has happened?
3  A.  Ravin has demonstrated it twice that I'm aware of.  I've
4     demonstrated it once via simulation.  I don't think you
5     can get there.
6  Q.  So, for example, in regards to Mr. Cordy, you don't
7     think that his crossbow was originally loaded with an
8     arrow in the intermediate position?
9  A.  I'm not here to discuss the Cordy case.  I'm not
10     prepared.  I did give a deposition a few weeks ago and
11     whatever was said there was said there.  I am here to
12     talk about Miles.
13  Q.  I would just ask you to answer the question.
14        MR. SUTTON:  He's not being offered here to
15     testify in other cases.
16        MR. MONACO:  It doesn't matter.
17        MR. SUTTON:  I think it does matter and he's
18     not prepared to offer to -- to answer questions on other
19     cases.  He's not here for it, it's not part of the
20     notice, and we would have objected to it if it was.
21     He's not here to answer questions on other cases and
22     you're not here to do discovery on other cases.  Those
23     attorneys can ask their own questions.
24        MR. MONACO:  But these cases all relate.
25     They're all Ravin misfire cases.  I don't see how you

## Page 63

1     can slice and dice one from the other.
2        MR. SUTTON:  They are not all related.  In
3     fact, his report -- and if you ask him his opinion is
4     that this one is completely different than all the other
5     ones.
6        MR. MONACO:  That's his opinion, that's not my
7     opinion.  They both occurred --
8        MR. SUTTON:  That was your own expert's
9     opinion.
10        MR. MONACO:  They both occurred during the
11     re-nocking of an arrow, or they all occurred -- or most
12     of them occurred while re-nocking an arrow.  That's a
13     similarity.
14        MR. SUTTON:  It's not a similarity.
15  BY MR. MONACO:
16  Q.  So it's your position that Mr. Cordy did not load his
17     arrow in the intermediate position?
18  A.  Again, I'm not here to discuss the Cordy case and I've
19     already been asked these questions and given those
20     answers.  The transcript as far as I know is publicly
21     available and you're welcome to go get it.
22        MR. SUTTON:  I think he has already.
23  A.  I mean, it's a matter of course through my entire career
24     I'm not going to answer questions in an active case that
25     I'm not actually being deposed in.  It's not

## Page 64

1     appropriate.
2        MR. MONACO:  Mr. Sutton asked Dr. Batzer about
3     the Cordy case in the deposition in this case.
4  A.  If Dr. Batzer elected to answer those questions that's
5     his prerogative.
6  BY MR. MONACO:
7  Q.  He's a stand-up guy.
8  A.  I wouldn't go that far.  He's a nice guy and I have no
9     problem with him personally.
10  BY MR. MONACO:
11  Q.  When a Ravin crossbow was loaded with an arrow that goes
12     into the intermediate position how is it then that a
13     re -- that a discharge can occur during a re-nocking
14     without a simultaneous pulling of the trigger occur?
15        MR. SUTTON:  Objection to form.
16  A.  Because the user has not put the bow back on to safe
17     which would prevent the clasp from releasing, and in
18     that situation when they put the arrow back in the sear
19     is resting against the ADF, and when the arrow is
20     further nocked it moves the ADF out of the way and
21     allows the bow to release.
22  BY MR. MONACO:
23  Q.  How does the clasp move out of the way during the
24     re-nocking?
25        MR. SUTTON:  You mean the ADF?

## Page 65

1        MR. MONACO:  No, the clasp.
2  A.  The bow string is pulling on the clasp.
3  BY MR. MONACO:
4  Q.  Correct.
5  A.  And when the ADF is moved out of the way in the
6     situation you've asked about the sear then can continue
7     to rotate and allows then the clasp to release the bow
8     string.
9  Q.  During the re-nocking process?
10  A.  When the user hasn't put the bow back on safe the sear
11     is being supported by the ADF.
12  Q.  And the re-nocking then moves the ADF?
13  A.  Correct.
14  Q.  And then that allows the sear to move?
15  A.  Yes.
16  Q.  And that allows the clasp to move?
17  A.  Yes.
18  Q.  And then there's a discharge?
19  A.  Yes.
20  Q.  And why can't that process occur without the original
21     trigger pull?
22  A.  Because the mechanism is, when fully engaged is stable
23     and requires the trigger pull which is the only way the
24     user can access the sear.  The trigger pull moves the
25     sear.  When the sear moves you can get into the

## Page 66

1  situation we've been discussing.  But the sear in and of
2  itself has biased springs and the clasp has biased
3  springs.  And when I say biased springs there are
4  springs that move those components in specific
5  directions and hold them in those positions until such
6  time as I pull the trigger.
7  Q.  But during re-nocking the ADF moves; correct?
8  A.  Yes.
9  Q.  Okay.  And for a discharge the ADF has to move into the
10  lower sear cavity; correct?
11  A.  Correct.  The ADF needs to be in a position where the
12  sear cannot contact the ADF in order for the sear to
13  move.
14  Q.  And during re-nocking of an arrow that pushes the ADF,
15  from left perspective that pushes it counterclockwise;
16  correct?
17  A.  Correct.
18  Q.  Okay.  And when that is done during re-nocking the ADF
19  can be pushed counterclockwise to the extent, and I'll
20  call it the tail just because I'm not an engineer,
21  enters into the lower cavity space of the sear?
22  A.  Yes, that's the design of the ADF.  That's the function
23  that's supposed to occur as the nock is fully engaged
24  onto the bow string.
25  Q.  So why do you need the initial trigger pull in this

## Page 67

1  sequence?  What does the initial trigger pull do?
2  A.  It moves the sear.  It overcomes the bias springs
3  associated with the sear.  The thing to understand here
4  and the thing that Dr. Batzer completely dismisses and
5  hasn't done any analysis on is that when this bow is
6  initially cocked prior to -- I'm sorry, when the trigger
7  mechanism is originally connected to the string --
8  Q.  Right.
9  A.  -- not cocked, not pulled back, not any of that sort of
10  thing there are a series of springs in here that result
11  in stable condition where the sear is forced against the
12  sear roller and will always remain in full and complete
13  engagement there.  And when you calculate all of that
14  that result in force is about 2.6 pounds between those
15  two parts.
16      Now, when I go to the fully cocked condition
17  now putting in excess of 100 pounds on the bow string
18  that force jumps up to 6.9 pounds.  So in the uncocked
19  position 40 percent of the force occurs from just the
20  bias springs.  And then when I cock the bow I only add
21  another 60 percent.
22      This condition, the uncocked condition, the
23  snapping on occurs when the user makes that connection
24  to the string.  Total control is the bias of the
25  springs.  When the bias of the springs occurs the sear

## Page 68

1  roller is always fully engaged with the sear, period.
2  There is no alternative configuration here.  And as a
3  result the only way that this bow is ever going to
4  release is if the safety is off and the sear is caused
5  to rotate out of the way of the -- or out from
6  underneath the sear roller.
7  Q.  I understand.  But my question is why do you need the
8  initial trigger pull?
9  A.  Because the mechanism is stable fully engaged and won't
10  go anywhere until you pull the trigger.
11  Q.  When you pull the trigger the trigger pawl -- am I
12  saying that right?
13  A.  Yes.
14      THE WITNESS:  Pawl is P-A-W-L.
15  BY MR. MONACO:
16  Q.  -- pushes against the bottom of the sear; correct?
17  A.  Correct.
18  Q.  And that puts a force where the sear is forced or has
19  pressure in the clockwise direction; correct?
20  A.  The -- I'll give it -- you're right, but I'll give it to
21  you in engineering terms.
22  Q.  Sure.
23  A.  There's a force between the pawl and the sear.
24  Q.  Okay.
25  A.  That force results in a moment on the sear that has a

## Page 69

1  tendency to rotate it in a clockwise direction when
2  viewed from the left side of the bow.
3  Q.  Correct.  So when you pull the trigger after an
4  intermediate loading of the arrow you're saying that the
5  sear moves slightly clockwise?
6  A.  Correct.
7  Q.  And how much does it move?
8  A.  It was a few degrees.  It really depends on where the
9  ADF is positioned.  There are instances where it doesn't
10  move at all and there are instances where it can move a
11  few degrees.
12  Q.  And you're talking about during the computer model?
13  A.  Even without the computer modeling when you put all the
14  parts together and look at the tolerances, that's the
15  answer.
16  Q.  You have never been able to view this, meaning you
17  haven't drilled holes, wide holes in the plate to this
18  triggering firing mechanism to see what's going on
19  inside; correct?
20  A.  No, I don't need to do that.  I basically have all of
21  the components in a digital environment and can look at
22  them basically in a much more convenient and meaningful
23  format in that environment than I could ever look at the
24  real part, the physical part.
25  Q.  When the trigger is pulled what happens to it, meaning

1    does it stay in a pulled position or does it go back to
2    its original position?
3    A.  It goes back to its original position.  Well, when the
4    bow is cocked and not discharged, it basically goes back
5    to its original position.
6    Q.  How about during a situation where you have the
7    intermediate loading of the arrow, so somebody pulls the
8    trigger, there's no discharge.  What happens to the
9    trigger then?
10   A.  It's going to still rest against the bottom of the sear.
11   Q.  And what causes that to happen?  What force is against
12   the trigger and the -- what is this horizontal bar
13   called?
14   A.  I forget the proper term, but a linkage, maybe.
15   Q.  Fair enough.  So what keeps the trigger and the trigger
16   linkage, the horizontal linkage from moving back to its
17   resting position?
18   A.  There's a spring that connects the top of the trigger,
19   this orange piece being the trigger and the end of the
20   linkage.  There's a spring that basically goes right
21   there which will always force it to be in contact with
22   the sear.
23          This spring via the trigger and the linkage
24   will always force the pawl to be in contact with the
25   bottom of the sear.

1    Q.  So you're saying even when the trigger is at rest that
2    the pawl is in contact with the sear?
3    A.  Yes, and the contact force between those two components
4    is 2.6 ounces, which is the analysis that we're looking
5    at right now.
6    Q.  So what is the force against the sear by the trigger
7    pawl if the trigger is never pulled?
8    A.  2.6 ounces.
9    Q.  And if the trigger is pulled it's the same?
10   A.  No, you would then apply force to the trigger with your
11   finger and whatever that force is would make its way
12   through the mechanism.  It's nominally a one to one.
13   So, in other words, if I apply a pound of force on the
14   trigger it would result in nominally a pound of force --
15   between the -- an additional pound of force between the
16   pawl and the sear.
17        THE WITNESS:  And it occurs to me sear is
18   S-E-A-R-just for reference.
19   BY MR. MONACO:
20   Q.  But when there's an intermediate placing of the nock the
21   ADF prevents that sear from rotating then; correct?  And
22   that's why it doesn't discharge?
23   A.  Correct.
24   Q.  Okay.  So my question is:  When the ADF is put into the
25   position of just being below the sear cavity because of

1    an intermediate placement of the arrow the force against
2    the sear by the pawl is this 2.6-pound you're talking
3    about; correct?
4    A.  No.
5    Q.  Not the 2.6?
6    A.  It's less than that.  The 2.6 ounces --
7    Q.  Ounces, I apologize.  Sorry.
8    A.  2.6 ounces is when everything is cocked and sitting in
9    its normal rest position --
10   Q.  Sure.
11   A.  -- ready for you to do whatever your next step is.
12   Because the sear moves a little bit this mechanism
13   rotates a little bit, this spring gets a little bit
14   shorter, that force will go down in the intermediate
15   position.
16   Q.  Down to what?
17   A.  It's -- nobody has done any calculations on this except
18   me so I did this one to be representative.  If this
19   force gets shorter, it will reduce by some, you know,
20   fraction of an ounce, probably, but it's not -- I
21   haven't done the math to that level.
22   Q.  But you believe that that force is enough to have the
23   sear rotate away from the sear roller?
24   A.  No.  When you go look at --
25   Q.  No, I'm incorrect, or no, that's what happened?

1    A.  Let me just tell you what happens.
2    Q.  Sure.
3    A.  This analysis of the result in force between these
4    components being 6.9 pounds and these components being
5    the sear and the sear roller --
6    Q.  Right.
7    A.  -- this analysis actually includes the trigger force.
8    So this, this whole arrangement is stable by a matter of
9    6.9 pounds, including that 2.6-ounce force from the
10   trigger pawl.
11   Q.  But that force is the same when someone is re-nocking
12   the arrow when the ADF is in this position just below
13   the lower sear cavity?
14   A.  I'm doing my best but I'm just not following your
15   question.
16   Q.  So the issue is whether the forces change because of a
17   trigger pull with the ADF in this intermediate arrow
18   position.  That's what I'm focusing on.
19        Do you understand that?
20   A.  Yes.  Every time you move one of these components you
21   have to go redo this series of calculations to come to a
22   conclusion as to what force it is that you're looking
23   for.  And there are obviously an infinite number of
24   possibilities.  I've done the math for a few of these in
25   here and, mind you, these are -- these will be called

1    statics calculations in engineering.
2    Q. Right.
3    A. While I'm using these computer images to illustrate what
4    it is I'm trying to do, this isn't the simulation that I
5    did. This is just straight up engineering. This is
6    something Dr. Batzer could have done to come to
7    conclusions on these things. So, yes, every time I move
8    one of these components I have to go redo this complete
9    series of calculations to come to the conclusion as to
10    what those answers are.
11          The series of calculations I've done is either
12    in the attaching the trigger mechanism to the string,
13    which is this calculation, the cocking of the bow and
14    what are the forces between the pawl and the sear, or --
15    Q. I apologize.
16    A. --or when the bow is fully cocked.
17    Q. Are these page numbers?
18    A. No, these are my notes. These are basically the things
19    that Dr. Batzer didn't know in his deposition and I went
20    and computed just to make sure somebody knew these
21    things.
22    Q. So you've done these after his deposition, or some of
23    them?
24    A. I think these were done after his Cordy deposition and
25    possibly before his Miles deposition.

1    Q. Fair enough. And these drawings that you're referencing
2    here, have you put those on the flash drive you're
3    providing to me?
4    A. Yes. They were provided in the Cordy deposition as
5    well.
6    Q. Are there page numbers or not?
7    A. No, they're my notes. It's a package of I don't know
8    how many pages, there's an analysis, the file and
9    everything is called an analysis.
10    Q. I'm just asking because you're referencing pages during
11    the deposition and when we read the deposition back
12    we'll have no idea what page you're referencing.
13    A. No. I understand. All of this is referenced -- all of
14    these files, everything that I've printed here, this is
15    a mere subset of my file. These are things I thought
16    might be useful during our discussion. This file is
17    absolutely on the thumb drive.
18    Q. I understand.
19          So why is it a trigger pull necessary for a
20    discharge during re-nocking?
21    A. All right. I've answered this one before and I'm going
22    to go through it in a little more excruciating detail
23    here. I'm not trying to offend you when I say this.
24    Q. No, not at all. I'm not an engineer. So if you help me
25    understand the process more then that's fine.

1    A. That's what we're going to do here.
2    Q. You want to mark this.
3    A. This is confidential information.
4          MR. SUTTON: This is confidential. We'll ask
5    the entire deposition be marked as confidential and
6    subject to a protective order.
7          MR. MONACO: That's fine with me.
8    DEPOSITION SAUNDERS EXHIBIT 2
9    Drawing
10    WAS MARKED BY THE REPORTER
11    FOR IDENTIFICATION.
12    A. So looking at Exhibit 2, the first thing I'm going to do
13    is draw in the location of the -- I call them bias
14    springs, B-I-A-S springs. It's called the sear spring
15    which sits right here. There's another one that sits
16    right there. There's another one on the ADF that sits
17    right there. There's one on the detent and there's one
18    on the back of the safety.
19          These are all compression springs with a
20    published free length. So when we look at the
21    engineering drawings, if I took that spring and laid it
22    on the table, there's a specification for how long that
23    spring should be.
24          When I then take that spring and put it in a
25    cavity that's shorter than that free length I now

1    compressed the spring and what it's going to try and do
2    is push against the two things it's reacting to and that
3    force that is specified also in the drawing is spring
4    rate or a pounds per inch of deflection of the spring.
5    BY MR. MONACO:
6    Q. Do we know or do you know the force that can be asserted
7    by each of these springs?
8    A. Yes.
9    Q. And you determined that how?
10    A. It's -- the free length is the uncompressed length of
11    the spring, and then there's a spring rate associated
12    with that, a pounds per inch of deflection. So, in
13    other words, if I, just to use a real crude example not
14    related to the case, if I took a spring that had a
15    1 pound per inch of deflection and I squeezed it down an
16    inch, it would be pushing back on my fingers with a
17    pound of force. Does that make sense?
18    Q. Yes.
19    A. And, so, we know the free length of these springs. We
20    also know the spring rate associated with these springs,
21    so, therefore, when we look at the mechanism at any
22    state we then know the force associated with that
23    spring.
24          The analysis that we were looking at earlier
25    is called a sum of the moments. And, so --

1  Q. I apologize. Can we mark that page, too.
2  A. Absolutely. You want the page or the packet?
3  Q. Just do the page. How many pages do you think you're
4     going to look at right now?
5  A. It depends on what questions are asked.
6  Q. No, for your answer right now.
7  A. Probably just these two.
8  Q. So we need --
9  A. Two more.
10 Q. -- 3 and 4?
11        DEPOSITION SAUNDERS EXHIBIT 3
12        Page Labeled sear Roller to Sear Force
13        (Equilibrium after connecting to the string.)
14        DEPOSITION SAUNDERS EXHIBIT 4
15        Page Labeled sear Roller to Ser Force
16        (Equilibrium after cocking.)
17        WERE MARKED BY THE REPORTER
18        FOR IDENTIFICATION.
19 A. Okay. So what I tried to highlight on Exhibit 2 is the
20    location of the springs.
21 BY MR. MONACO:
22 Q. Right.
23 A. What we talked about is the concept if I compress those
24    springs they're going to try to spring back. When
25    they're pushing on the part they're pushing on the part

1  in a given direction. So what I'm going to do is then
2  draw -- I'm going to put Xs on the pivot points. Those
3  three parts pivot on their respective Xs and what I'm
4  also going to draw is a circular arrow with an
5  arrowhead. That is the direction that that spring is
6  trying to push that part.
7        And just so that becomes a little more clear
8  on the record, the spring associated with the clasp is
9  trying to move it in the clockwise direction when viewed
10 from the left of the bow. The spring associated with
11 the sear is attempting to move it in a counterclockwise
12 direction. The spring associated with the ADF lever is
13 attempting to move it in a clockwise direction.
14       So, when you look at the situation where the
15 trigger mechanism has been clipped onto the string what
16 happens is the string moves to the back of the cavity
17 that's in the clasp and then tends to rotate the clasp
18 in the counterclockwise direction. What that does is
19 move the sear roller from the lower cavity of the sear
20 around the nose at the sear ledge and then back into the
21 cavity of the sear. So it sits here when it's uncocked
22 and the clasp is in the open position and it rotates up.
23       Once that's all said and done, in other words
24 I've pushed the string on the back of the clasp,
25 everything is rotated in position, the string is now

1  captured. There are no forces acting on this mechanism
2  other than the bias springs.
3        Exhibit 3 is a calculation showing the
4  resultant force between the sear roller and the sear
5  ledge. And because it's a positive force it means that
6  this is rotating these two parts together based on the
7  manner in which I set the problem up.
8        So what it says is that this mechanism, the
9  calculation in Exhibit 3 shows that this mechanism is
10 stable with the sear engaging on the sear roller and
11 that's where it wants to stay for now and forever.
12       When I add into that situation cocking of the
13 crossbow, I now add a force. And I'm going to draw an
14 arrow on Exhibit 4 showing the string force direction,
15 although I think that's going to be relatively obvious.
16 A force that's nominally 100 pounds or slightly in
17 excess of 100 pounds, the string is trying to push its
18 way out of the collapse, if you will.
19       The other force that's present is the force we
20 talked about earlier between the pawl and the sear. The
21 calculations on Exhibit 4 are just a repeat of the
22 calculations from Exhibit 3 except now accounting for
23 the forces associated with the string and the pawl.
24 Again, it results in being a positive number. It's now
25 6.9 pounds as opposed to 2.6 pounds which means it's

1  even more stable.
2        So when I cock the crossbow I don't pull the
3  trigger. What this analysis shows is that for now and
4  forever the sear roller is going to remain engaged in
5  the sear and unless I pull the trigger to intentionally
6  rotate the sear clockwise this bow is never going to
7  discharge.
8  Q. So how does it discharge during the re-nocking when
9     there's not a simultaneous pulling of the trigger?
10 A. Because the trigger pull has already occurred.
11 Q. And what did that do?
12 A. That rotated the sear, brought it into contact with the
13    ADF and now the sear is being supported by the ADF.
14 Q. So when the re-nocking occurs if you're looking at
15    Exhibit 4, that will rotate the ADF counterclockwise;
16    correct?
17 A. Yes.
18 Q. And then the tail end as I will call it as a layperson
19    then goes up into this lower sear cavity; correct?
20 A. Correct.
21 Q. And during that process there's force from the clasp;
22    correct?
23 A. There's always a force being applied by the bow string
24    to the clasp in the uncocked -- or in the cocked
25    condition.

1    Q. Does the bow string force against the clasp put force in
2    a clockwise direction?
3    A. Yes, although it's from a moment perspective and for
4    that matter a force perspective it's actually a mere
5    fraction of the actual bow string force, because the --
6    I'll just put another sketch on here because it will
7    make sense. I'm doing a set of parallel lines on
8    Exhibit 4 to show -- to support the next answer I'm
9    going to give.
10         From an engineering perspective what's
11    happening is the bow string is applying a force to the
12    clasp. What we really care about is how is it trying to
13    rotate the clasp.
14    Q. Correct.
15    A. As an engineer I would describe that as a moment, and
16    the distance that force is applied off of the center of
17    rotation is called the moment arm. So it's force times
18    the distance. The force is quite large relative to the
19    other forces.
20    Q. Sure. Because the bow string is pulled all the way
21    back?
22    A. The distance is extremely small. So when I multiple
23    those two together I'm going to get an extremely small
24    moment relative to what you might expect from the
25    magnitude of the force.

1         And in that situation what the calculation on
2    Exhibit 4 shows is that the forces associated with the
3    two bias springs that matter, the one on the sear and
4    the one on the clasp, actually generate more of a moment
5    than the force from the bow string, and as a result it's
6    always stable with the sear resting, or the sear roller
7    resting on the sear ledge and in the back wall of the
8    sear.
9    Q. And this is with the ADF in the position after being
10    moved by the intermediate placement of the arrow?
11    A. No. This -- the thing you got to realize is that the
12    ADF is biased such that it's always in contact with the
13    face of the sear at this location. In other words, if
14    we go back to Exhibit 2, I pointed out that there's a
15    spring in here. It's always going to be forcing the ADF
16    lever to rotate in the clockwise direction when viewed
17    from the left. And as a result it always makes contact
18    at the face of the sear where you called it the tail of
19    the ADF.
20         You're missing springs in the picture you've
21    got.
22    Q. Sure. So it's your position that the ADF is always in
23    contact with the bottom of the sear?
24    A. Until you get, until you get the -- couple things.
25    There's three different things that come into play here.

1    Until I get the ADF spring to its free length it will
2    always be forced to rotate around.
3    Q. Right.
4    A. It will either rest in one of two positions. It will
5    either rest against the stop for the ADF which -- I'll
6    put a blue X in the middle of that. I'll put a blue X
7    in the middle of what I will call the ADF stop on
8    Exhibit 2. If that ADF contacts that it will stop
9    rotating or the serrated edges will catch on the corner
10    of the sear mechanism and it will always be in contact
11    with the sear.
12    Q. So it could be -- I apologize. The X is called what
13    below the ADF?
14    A. I would call it -- the function that it's serving is the
15    stop, the rotation stop.
16    Q. So it's you're position the ADF could be touching the
17    stop and the sear at the same time?
18    A. Possibly. I haven't gone and looked at its full range
19    of motion. The things that are controlling this action
20    are the free length of the ADF spring and when does the
21    free length occur relative to when the ADF contacts the
22    stop, and then in terms of how it will always basically
23    be close to or in intimate contact with the sear.
24    Q. But if it's not in contact with the sear, correct, that
25    is -- let me back up.

1    So how is it not in contact with the sear if
2    the trigger pawl is putting force against the sear?
3    A. Because when you look at the -- let me go back to -- so
4    I'm back to Exhibit 4. And I'm going to put a circular
5    arrow with an arrowhead on it showing you the resultant
6    moment when this is all in static equilibrium.
7         So basically when all these parts are here
8    doing what they do including the bow string force,
9    including the bias springs associated with the sear and
10    the clasp and including the force associated with the
11    pawl to sear contact, the resultant moment is tending to
12    move the sear in a counterclockwise direction, which
13    basically will always mean that the sear remains engaged
14    with the sear roller. And as we discussed earlier,
15    40 percent of that force or that moment is coming from
16    the bias springs, and the other 60 percent of that force
17    is coming from the bow string.
18    Q. It's your position that that is not enough force to
19    allow a discharge during re-nocking unless the sear had
20    previously been moved by the trigger pull?
21    A. This analysis is what the mechanism looks like when you
22    either connect the trigger mechanism to the string or
23    you cock the crossbow.
24    Q. Right.
25    A. This force balance is not associated with the ADF and I

1     think where you may be getting tripped up is the ADF
2     doesn't move until an arrow is installed.
3    Q.  Correct.
4    A.  This analysis has nothing -- we haven't gotten to that
5     step. I can go do that analysis if you want, or for
6     that matter Batzer could do it and should have done it
7     if he wants to express it as an opinion, but these
8     analyses talks about the stability of the mechanism
9     prior any to trigger pull and prior to any insertion of
10     the arrow.
11   Q.  So you haven't done the calculations regarding forces
12     once an arrow is loaded?
13   A.  No. I could very easily go do those calculations. They
14     aren't necessary for my analysis or opinions but
15     absolutely I could give you an answer to those
16     questions.
17   Q.  And it's also correct that you haven't done this type of
18     analysis when an arrow is placed in the intermediate
19     position?
20   A.  Correct, because I don't think that happened in this
21     case based on your client's testimony, so there's no
22     motivation for me to go and do that analysis. This
23     analysis shows that the trigger mechanism is stable in a
24     condition when the sear is fully engaged with the sear
25     roller.

1    Q.  So you don't think Mr. Miles loaded his arrow in an
2     intermediate position?
3    A.  If we take his testimony being the only evidence we have
4     in this case as to what Mr. Miles did, the calculations
5     that I've presented to you and the discussion we've had
6     with regard to Exhibits 2, 3 and 4 say he can't get it
7     in an intermediate position. It's not necessarily my
8     position, this is what the engineering mechanics shows
9     and says. So it's not an opinion, it's the analysis.
10   Q.  I lost you right there because if other people can put
11     the arrow in an intermediate position why couldn't
12     Mr. Miles put it in an intermediate position?
13   A.  Because the definition of the intermediate position
14     requires someone to pull a trigger. If the sear doesn't
15     move as a result of a trigger pull that condition will
16     never exist.
17   Q.  Okay. So you're saying that the arrow is not in the
18     intermediate position before the trigger is pulled?
19   A.  I don't think so.
20   Q.  I thought that's what you just said?
21   A.  Although I didn't follow your question, so --
22   Q.  Let me ask it again.
23   A.  Let me just tell you what I'm saying as opposed to ....
24          In your client's situation --
25   Q.  Right.

1    A.  -- your client says that he connects the trigger
2     mechanism to the bow string. That's the analysis that
3     we see in Exhibit 3.
4    Q.  Okay. Meaning he's in the process of cocking?
5    A.  No.
6    Q.  No?
7    A.  I'm going to add one more arrow to Exhibit 3 just to
8     emphasize the point and then I'll finish my answer to
9     the question.
10   Q.  Sure.
11   A.  If you look at Exhibit 3, Exhibit 3 addresses the first
12     step in what your client testified that he did, and that
13     is that he released the trigger mechanism ratchet, he
14     pushed it down and just simply clicked it onto the bow
15     string. This is prior to any cocking, prior to
16     insertion of any arrow.
17   Q.  You're talking about when the bow string is in the rest
18     position?
19   A.  Correct. The analysis shown in Exhibit 3 and
20     specifically the arrow, the circular arrow with an
21     arrowhead on it that I've drawn is the resultant moment
22     as a result of the bias springs will always tend to
23     rotate the, not always tend, it will always rotate the
24     sear in the counterclockwise direction resting against
25     the sear roller. That's what these two springs will do.

1    Q.  Okay.
2    A.  Then your client says I cocked the crossbow, meaning
3     that I put the handle in and I cranked it back until
4     it's all the way in the fully cocked position.
5    Q.  Correct.
6    A.  And the thing that we need to note here is that when
7     Exhibit 3 doesn't -- was -- when your client clicked
8     this on by default this safety will be rotated over and
9     in contact. So this, this illustration needs to be
10     updated because as part of this cocking process that
11     safety goes into the safe position. Let me say it a
12     different way.
13         As part of the attachment process of
14     connecting the trigger mechanism to the string it will
15     set the safety into the safe position. Same exists
16     here.
17   Q.  I understand.
18   A.  So then the next step is your client says I cocked the
19     crossbow by cranking it back. That's the analysis
20     that's done in Fig. 4 -- or Exhibit 4. And, again, it
21     shows that when you look at all of the forces on the
22     various components in here the sear will always have a
23     counterclockwise moment forcing it into engagement
24     between the sear and sear roller. Then your client says
25     I attempt to move it from safe to fire, it won't move,

1    it stays in safe.
2    Q.  Well, he loaded the arrow first?
3    A.  Agreed.  He loads the arrow which would rotate the ADF
4    here.  But, again, that's got nothing to do with moving
5    the sear.  The sear won't move just because the ADF is
6    moved because of this moment.  Okay?  This static
7    analysis says the sear roller always will remain in
8    contact.  So fully inserting the arrow and moving the
9    ADF out of the way such as in the cavity has nothing to
10   do with movement of the sear with the clasp.
11         Then your client says I attempt to move it to
12   fire, the safety won't move.  So then I unnock the arrow
13   and I re-nock the arrow.  Again, the only action that
14   unnocking and re-nocking the arrow is going to have is
15   to rotate the ADF lever.  But at that point without a
16   trigger pull there is no -- the movement of the ADF
17   doesn't have any meaningful interaction with the sear.
18   And, in fact -- one more sketch I think might clear this
19   up for you.
20         So what I'm doing is putting another sketch on
21   top of Fig. 2.  If we can imagine a little rectangular
22   piece that I've drawn on there is the nominal position
23   of the ADF when the arrow is fully installed, a gap then
24   develops between the tip of the ADF and the sear because
25   the sear doesn't move when the ADF moves absent a

1    trigger pull.
2          So what this analysis says, again, sear and
3    sear roller are always in engagement unless there's a
4    trigger pull.  Your client never pulled the trigger.  As
5    a result the sear is never bearing on the ADF, and if
6    the sear is never bearing on the ADF I can move the
7    arrow in and out all day long and it will never
8    discharge.  The only thing that's going to happen is the
9    ADF lever is going to rock in accordance with the
10   position of the nock.
11   Q.  But my question was how do you rule out that his arrow
12   was placed in the intermediate position because he could
13   have -- I see.  Meaning he loads the arrow and he could
14   load it short like the other people did; correct?  And
15   that would move the ADF just partially; correct?
16   A.  Agreed.
17   Q.  So my question was:  Mr. Miles could have loaded his
18   arrow in the intermediate position?
19   A.  Yes.
20         MR. SUTTON:  Objection to form.
21   BY MR. MONACO:
22   Q.  I thought you said no before?
23   A.  Yeah, he could have loaded it there but he never pulled
24   the trigger.
25   Q.  I didn't ask you that.

1    A.  But it doesn't make any difference.
2    Q.  I didn't ask you that.  You're talking about the result.
3    I'm saying he could have loaded his arrow in the
4    intermediate position?
5    A.  Right, but unless he pulls the trigger of it's no
6    consequence.
7    Q.  I wasn't asking you that.  I was just asking you that he
8    could load the arrow in the intermediate position, and
9    he could have; correct?
10   A.  It's within the range of possibilities although I think
11   it's highly improbable based upon the force balance that
12   exists between the snap action of the nock onto the bow
13   string.
14   Q.  I understand your position.  I just wasn't, I wasn't
15   asking that.
16         So let's talk about Mr. Miles' arrows.
17         Do you have a copy of your report?
18   A.  I do.
19   Q.  Thank you.  Turn to page 15.
20   A.  Okay.
21   Q.  I apologize.
22         MR. MONACO:  Go off the record for a second.
23         (An off the record discussion was held)
24         MR. MONACO:  Let's go back on the record.
25   BY MR. MONACO:

1    Q.  Page 19 of your report.  You have a photograph of the
2    arrows that were provided when you inspected Mr. Miles'
3    crossbow; correct?
4    A.  Yes.  It appears it's Fig. 12 in my report.
5    Q.  And there are --
6    A.  It's Fig. 6 in my report of 12 arrows.
7    Q.  You really throw me.
8    A.  I'm doing my best.
9    Q.  I got the wrong pages, the wrong figures.  That's all
10   right.
11         So there are 12 arrows; correct?
12   A.  Yes.
13   Q.  Let me ask you this.  When Mr. Miles received these
14   arrows, were the white nocks already in place?
15   A.  I can't speak to his interaction, but whenever I've
16   purchased these they've always come as fully assembled
17   assemblies, nocks, arrows, all as one unit.
18   Q.  And it would be fair to say, though, the tips aren't in
19   place when you get the arrows?
20   A.  Correct.  As in the field points the broad heads are
21   always going to be a separate purchase and they are user
22   installed.
23   Q.  Okay.  Fair enough.
24         Turn to page 20.  You reference photographs on
25   page 21, Figs.  8 and 9.  Do you say that?

1   A. Yes.
2   Q. So you indicate that this type of damage -- I'm sorry,
3      I'm on the top of page 20. Sorry about that.
4         You indicate that this type of damage occurs
5      when a user uses improper targets not designed for use
6      with crossbows which allows the arrows to bury deeply
7      into the target making it difficult to remove; correct?
8   A. Yes.
9   Q. Do you know what type of targets Mr. Miles was using?
10  A. He described one as a block target which is meaningful
11     to me but not necessarily to you. And he described the
12     other one as a 3-dimensional target, it looks like a
13     deer to you and me and it's got a soft spot, if you
14     will. That's the actual target area.
15        DEPOSITION SAUNDERS EXHIBIT 5
16        Crossbow target
17        DEPOSITION SAUNDERS EXHIBIT 6
18        Deer target
19        WERE MARKED BY THE REPORTER
20        FOR IDENTIFICATION.
21  BY MR. MONACO:
22   Q. Mr. Saunders, I've placed two photographs in front of
23     you as Exhibit 5 and Exhibit 6.
24   A. Yes.
25   Q. Have you seen these photographs before?

1   A. I think so. I think they may have been part of the
2     discovery that you all produced in this case.
3   Q. During Mr. Miles' deposition he indicated that he was
4     setting his scope; correct?
5   A. He was sighting the bow ring, yes.
6   Q. I'm sorry. I apologize. He was setting his scope.
7       And he indicated that he was doing that
8     according to the instructions in the manual; correct?
9   A. Yes, but I think his procedure actually differed from
10     what was in the manual but not in any meaningful way.
11   Q. So basically he sets his scope with the targets at
12     different distances away from himself; correct?
13   A. Yeah. The way the system is designed is that if you get
14     a sighting at one yardage, there's a -- when you look
15     through the bow there's various features called a
16     reticle -- R-E-T-I-C-L-E, I think. In short when you
17     look through there, you'll see a series of dots.
18   Q. Right.
19   A. And those dots have a number next to them and that
20     number corresponds to yardage. The theory goes if I get
21     it sighted in at 20 yards and there's a speed setting on
22     the scope that is matched to the speed of the bow a
23     sighting at 20 yards I should be spot on it, 30, 40, 50,
24     whatever other yardage I look at.
25   Q. But people like to double-check?

1   A. Oh, absolutely.
2   Q. So, looking at Exhibit 5, is that a crossbow target?
3   A. I did not do any research on this specific one but
4     basically when you look at it Muzzy is a brand name --
5     M-U-Z-Z-Y -- and this one is the Bow Hunter -- the
6     bottom part is illegible.
7       So, again, without doing research on it, Muzzy
8     is a vertical bow brand name or a compound bow brand
9     name. This is more likely than not intended for
10     compound bows and not crossbows, although I didn't do
11     that research specifically.
12   Q. But in your report you state that he was using improper
13     targets.
14   A. No, the statement that I made in here is that this type
15     of damage occurs when a user uses an improper target
16     because it allows the arrow to bury too deeply. So I
17     didn't specifically say he was using them. I'm just
18     saying this type of damage we see is the result of that.
19   Q. Can it be the result of anything else?
20   A. No. My experience when you need to put pliers in the
21     back of an arrow to get it out of a target it's because
22     it's sunk in so deeply that you're typically up to the
23     veins or maybe even buried the veins and that's because
24     the target is not properly matched with the thing you're
25     shooting at the target.

1   Q. But you haven't done any research regarding the targets
2     that Mr. Miles was using; correct?
3   A. I haven't looked up the specific Muzzy brand name target
4     that we're looking at here. I'm not aware of any 3-D
5     buck targets that are specifically rated for crossbows
6     as we sit here today, but I do have considerable
7     experience with vertical bows and crossbows and
8     appropriate targets for those two devices.
9   Q. I understand.
10      Do you know what target these three arrows
11     were buried in?
12   A. His testimony is that he had shot, and I don't remember
13     the specific yardages during his deposition, but he had
14     shot at a shorter distance, by memory 20 yards but the
15     record is what it is. I think he moved on to 30 and
16     then he was at 60 and he had done three to four shots at
17     each of those distances and was shooting at the 60-yard
18     target when his incident occurred.
19   Q. But my question was: Do you know what target these
20     three arrows shown in Fig. 8 were buried in that there
21     was a need to remove them with a pliers-type tool?
22   A. Based on his testimony he only used -- his testimony is
23     he only used three to four arrows and all of the arrows
24     presented to us there were four that were used, he fired
25     them in total ten times. So I have four arrows that

## Page 98

1   were fired ten times into three different targets, so in
2   theory all four of those arrows were at each of these
3   targets at some point.
4   Q.  You don't know that because one arrow could have been
5   used eight times?
6   A.  That's not his testimony.  His testimony is I shot in
7   groups of four, I moved from one yardage to the next, so
8   the theory being I shoot four at the deer -- and we're
9   looking at Exhibit 6 when I give this answer -- I shoot
10  four at the dear, I retrieve my arrows, I shoot four at
11  the next target and I retrieve my arrows.  And then I
12  shoot four at the longer distance target in the
13  background and I retrieve my arrows.  That was the
14  process he testified to.
15  Q.  Do you know who -- I apologize.
16          In Fig. 8 do you know whether those grip marks
17  occurred before or after Mr. Miles' injury?
18  A.  They were presented as evidence in this case.  He says
19  he used four arrows.  I see grip marks on four arrows.
20  So it is my assumption based on all of the physical
21  evidence and the testimony that exists that these were
22  created before his accident.
23  Q.  How do you know that?  They could have been --
24  A.  Did you all produce random arrows for any particular
25  reason or did you give me evidence in the case?  That's

## Page 99

1   how I know.
2   Q.  How do you know that one of these arrows with the grip
3   marks was an arrow that was being used during his
4   incident?
5   A.  Because everything is consistent.  He owns 12 arrows.
6   Q.  Right.
7   A.  Twelve arrows were presented for inspection --
8   Q.  Right.
9   A.  -- at the inspection.  His testimony is I used three to
10  four arrows typically and when I look at his set of four
11  arrows -- of 12 arrows four of them were used.  So it is
12  consistent with his evidence.  Unless you all are
13  producing random unrelated evidence he used four arrows
14  and there were four used arrows in his set of 12 arrows.
15  Q.  But is there only grip marks on three of the arrows?
16  A.  Four, I think.
17  Q.  Fig. 8 shows three?
18  A.  Those are just representative of the typical arrow
19  damage.  I didn't take pictures of each one.  I have
20  pictures of each one but I didn't present each one.
21  Q.  So you believe that there are grip marks on four arrows?
22  A.  I can go back and review my photographs but, yes, I
23  thought they were all consistent.
24  Q.  When someone is attempting to load an arrow after the
25  crossbow has been cocked back is it possible to get the

## Page 100

1   nock completely above the bow string?
2          MR. SUTTON:  Objection to form.
3   A.  I'd have to take a look at that.  I don't know the
4   answer sitting here.
5   BY MR. MONACO:
6   Q.  Is it possible to get the nock completely below the bow
7   string?
8   A.  That I wouldn't expect to be possible, but, again, it's
9   not something I've specifically looked at.
10  Q.  Now, if the -- I apologize.  Looking at Fig. 8 --
11  A.  And just, and just to be clear --
12  Q.  Sure.
13  A.  -- if you do manage to get the bow -- the nock above or
14  below the bow string and you manage to pull the trigger
15  and managed to get the thing to discharge, it's going to
16  be a dry fire and you're going to be looking at a heap
17  of parts.
18  Q.  So it's your opinion based on what you just said that
19  when Mr. Miles' crossbow fired that the arrow couldn't
20  have been completely above or below the bow string?
21  A.  Based on the condition of the 12 arrows that were
22  presented none were missing fletchings, and if you
23  manage to get it in there and then manage to get the bow
24  to discharge, the bow string is going to strip off at
25  least one of the fletchings.

## Page 101

1   Q.  Okay.  Fair enough.
2          Looking at Fig. 8 you have the white nocks;
3   correct?
4   A.  Yes.
5   Q.  And then just to the right of that there's brass?
6   A.  I think it's aluminum.
7   Q.  Fair enough.
8   A.  But the one on the other end is brass.
9   Q.  It's some type of metal that the nocks are screwed into;
10  correct?
11  A.  I don't think so.  It's a snap action.  What you got is
12  a composite shaft, the black material, if you will, in
13  Fig. 8 and then there's a gold or a silver color
14  material, it's an aluminum insert that goes inside of
15  the shaft and you got the white nock which connects to
16  the aluminum component.
17  Q.  Do you believe that during any of the shots that
18  Mr. Miles took that day that -- before the cocking of
19  the crossbow that was incidental to his incident, do you
20  believe that any of these aluminum pieces could reach
21  the bow string?
22  A.  No, I don't think the aluminum piece could ever reach
23  the bow string, but I think the back end of the
24  composite shaft could.
25  Q.  Go ahead.

1   A.  You don't have the benefit of seeing this photograph in
2      color while the one you brought with you.
3   Q.  Correct.
4   A.  But if you look at the top image of Fig. 8 from my
5      report there's a split in the composite shaft that runs
6      not quite to the fletching but well up in direction, and
7      what you can also see is that the aluminum insert is
8      actually partially pushed into the back of the shaft.
9   Q.  Okay.
10   A.  Whereas when you look at the lower two images in Fig. 8
11      or for that matter the Fig. 9 you can see that that
12      insert is not pushed up into the shaft.  In fact,
13      there's a ledge, if you will, in the back of the insert
14      that's bearing on the back of the shaft.
15         So the top image of Fig. 8 absolutely shows
16      that the aluminum has been pushed up inside the shaft,
17      and given the actions that can take place during a
18      firing of a crossbow you can sink this further in during
19      the acceleration phase of the shot, and at the end of
20      the shot when I'm now attempting to extract the bow
21      string at the end of the acceleration of the arrow, I'm
22      going to apply force in the opposite direction and have
23      a tendency to pull it back out.
24   Q.  So you think that top arrow was the one that was in the
25      crossbow during his incident?

1   A.  More likely than not, yes, but I can't say that
2      definitively.
3   Q.  So you think that the split to that shaft occurred
4      during the incident discharge?
5   A.  From a physics and mechanical engineering standpoint it
6      makes the most sense with all the physical evidence that
7      is presented, yes.
8   Q.  Is it your opinion that the bow string sliced before the
9      discharge?
10   A.  We don't have the string to look at so we can't make an
11      assessment of that.  The string was not retained.  But
12      with all of the physical evidence that does remain, that
13      is a distinct possibility, that the string was being
14      progressively damaged by an arrow in the condition that
15      we see at the top of Fig. 8 and it just happens to be
16      that at the moment of his incident is when it finally
17      let go.
18   Q.  But if the aluminum pieces can't touch the bow string
19      how does that grip damage damage the bow string?
20   A.  The back end of the arrow shaft can contact the string.
21      In other words, as I see in the top image of Fig. 8 the
22      nock and the aluminum piece have been forced inside of
23      the shaft and, so, when I force it inside now the back
24      edge of the actual composite shaft can come back and
25      touch the bow string.

1   Q.  So you think that occurred before the discharge?
2   A.  I think if we had the bow string what we would have seen
3      is progressive damage to that bow string, not just a one
4      time event, and that the happening of his event was the
5      final straw that broke the camel's back, so to speak.
6   Q.  So you think 11 shots that that bow string sliced in
7      half from the force of him loading the arrows?
8   A.  No.  I think that 11 shots with badly damaged arrows
9      were progressively damaging the bow string and the most
10      likely with, again, the physical evidence that remains
11      some of it has been discarded, that's the scenario that
12      I think is most likely in his particular circumstance.
13   Q.  But that top arrow in Fig. 8 is the only one where the
14      aluminum was pushed into the shaft?
15   A.  Correct.  The rest are badly damaged, they have cracks
16      in that area, but the one in the top of Fig. 8 is the
17      only one that's been forced up inside.
18   Q.  So that means all the other arrows couldn't have touched
19      the bow string except for the nock?
20   A.  Based on the physical evidence that exists now, yes,
21      that is true, although they're all remarkably damaged
22      and they're well on their way to exhibit this
23      phenomenon.
24   Q.  So you think that the one arrow, which by your testimony
25      regarding Mr. Miles' testimony, which at the most could

1      have been shot three times -- correct?
2   A.  Based on his testimony 10 shots, four arrows, so it's 2.
3      whatever times.
4   Q.  Okay.  So you think during that 2. whatever times that
5      that arrow with the split shaft sliced the bow string?
6   A.  I think that is a possibility in this case.  And, again,
7      if the bow string had been retained we would have the
8      physical evidence to completely come to closure on that,
9      but it hasn't been so we can't.
10   Q.  Can you say within a reasonable degree of engineering
11      certainty that the bow string was sliced by that arrow
12      at the top of Fig. 8?
13         MR. SUTTON:  Objection; form.
14   A.  I can say with the evidence that remains that is a
15      distinct possibility.  I can't say with absolute
16      certainty because the evidence wasn't retained, it was
17      disposed of.
18   BY MR. MONACO:
19   Q.  I didn't ask you for absolute certainty.  I said can you
20      say within a reasonable degree of engineering certainty.
21   A.  Based on my understanding about how all this hardware
22      works that is a scenario that makes most sense and I
23      think it's greater than a 51 percent opinion that that's
24      what happened in this case.  But because the evidence
25      was disposed of I can't say anything more than that.

Page 106

1  Q. Okay. Let me ask you this. I apologize. So you think
2     that the -- that there's a -- strike that.
3        You think there's a possibility that the bow
4     string sliced before the discharge?
5  A. I think the ultimate separation of the bow string is
6     more likely than not what happened in this case, and
7     that that damage to the bow string that resulted in that
8     separation was progressive in nature. And if the
9     evidence still existed I could point you to the
10    mechanisms that would make that happen.
11 Q. But my question was: Your opinion is that there's at
12    least a 51 percent probability that the bow string was
13    sliced before the discharge?
14 A. It was progressively damaged before the discharge and
15    then the final seating, I think his testimony was he was
16    -- reading his testimony, and it would take me a bit to
17    find you the quote, but he basically was really trying
18    to get it in there that last time, all of that makes
19    absolute sense that I've got a progressively damaged bow
20    string, I'm really kind of whaling on it to get it in
21    there, I got an arrow that exhibits the condition that
22    we see at the top of Fig. 8 with the shaft actually now
23    contacting the string and that's the straw that breaks
24    the camel's back and the thing discharges.
25 Q. But my question is: Does it get sliced in half before

Page 107

1     the discharge?
2  A. It's progressively damaged and the action which he's
3     doing at the final nocking is the last thing that -- the
4     final separation. When I say progressive damage, these
5     bow strings are made up of -- I don't know the count on
6     this one without going back and looking at the
7     drawing -- a number of uniaxial fibers. I think that
8     some of those fibers were cut prior to this accident and
9     the final fiber is cut that causes the thing to
10    ultimately separate under load is as a result of him
11    making that last nocking.
12 Q. Well, that was my question. You think that this
13    discharge was a result of the bow string slicing in half
14    before or just at the moment of the discharge, meaning
15    as opposed to slicing in half when it cuts through his
16    finger?
17 A. Let's be clear. When you say discharge, that later in
18    time could be interpreted as the bow somehow
19    discharging. In other words, the mechanism releases the
20    string. And what I'm saying is the mechanism never
21    releases, the string is simply sliced and then is free
22    of the mechanism and the mechanism is sitting there
23    thinking Oh, wow, it's still holding the bow string.
24    Does that distinction make sense?
25 Q. Yes, it does.

Page 108

1     So you're saying there's at least a 51 percent
2     possibility that the bow string is sliced in half and
3     when that half -- when that discharge happens that that
4     trigger mechanism assembly does not -- strike that.
5  A. You're almost there, by the way.
6  Q. The trigger assembly wouldn't move anyway in a regular
7     discharge if it still sits at the back of the crossbow;
8     correct?
9  A. The internal -- in a normal discharge of this bow the
10    sear moves out of the way, the clasp rotates. What I'm
11    saying is none of that occurred. The string that was
12    now in the clasp remained in place because the string
13    was in tact and when the string breaks it now just pulls
14    out of either side of the clasp.
15 Q. I understand. I was just getting a little off base, I
16    was thinking that the whole housing moved forward, but
17    it never does that. I apologize.
18       So you're saying this bow string gets sliced
19    in half and it can cause a discharge and in that type of
20    scenario that means that this clasp did not have to move
21    up?
22 A. Correct.
23 Q. Now, would you agree that when a bow string is sliced in
24    half that the force or the energy from the bow would
25    pull the string remnants out and away from the center?

Page 109

1  A. Yes. I mean, that's ultimately the direction you're
2     going to go. I've actually done this, not in this case,
3     but I have cut a bow string on a cocked crossbow and
4     viewed it with high speed video. It doesn't do
5     necessarily what you expect it to do. It moves in all
6     sorts of different directions. In fact, in my instance
7     when I did it it actually cracked the stock of the
8     crossbow in half because it was loading the crossbow in
9     an unintended manner. So it's -- it's not as simple
10    as -- you know, it goes from point A to point B. It
11    does a lot of things that we don't necessarily perceive
12    of because it happens so fast.
13 Q. You haven't done this type of testing in regards to a
14    Ravin crossbow; correct?
15 A. No, I haven't.
16 Q. Have you done computer modeling?
17 A. I wouldn't even know how to begin computer modeling.
18    There would be way too many variables.
19 Q. Fair enough. What sliced through Mr. Miles' finger?
20 A. Based on the level of injury we have here it has to be
21    the bow string. That's the only thing that brings
22    enough energy to the table to do the damage that we see.
23 Q. And you've never done any calculations or testing to see
24    how much force remains in the bow string if it's sliced
25    by placement of the arrow?

## Page 110

1  A.  Well, by definition after it's sliced no force remains.
2      But it's still -- all of that mechanism is moving back
3      to the rest position so the string is going to get
4      pulled around at a high rate of speed and if it does
5      contact something while it's doing that, then force will
6      then come back into the string because I'm now reacting
7      the end of that string.
8  Q.  But you've never done any calculations to determine
9      whether enough force can remain or be created in a
10     string remnant to slice through his finger?
11 A.  It's been discussed in terms of energy.  I have a
12     certain amount of stored energy in the bow when it's
13     cocked and that level of energy doesn't change just
14     because I cut the string.  It just means that now that
15     energy is available to do work on other things including
16     fingers.
17 Q.  But you've never done any calculations regarding whether
18     there's enough energy for the string remnant to cut
19     through his finger?
20 A.  It's no different than a situation where -- I'll give
21     you an analogy here and hopefully drive this home.  If I
22     loaded an arrow completely into this bow, I moved it off
23     of safe, I stuck my finger in front of the string and I
24     pulled the trigger, I've got the same amount of energy
25     in that scenario as I have in the scenario where the

## Page 111

1      string is cut.  There's zero difference in terms of the
2      energy.  How the string moves is a little bit different,
3      I'll give you that, but the amount of energy and its
4      availability to do work on other items including fingers
5      remains the same.
6  Q.  So you're saying that the -- and one of the remnants of
7      a sliced bow string can maintain the same amount of
8      energy as a bow string that never sliced in half?
9  A.  Yes.  The bow has a fixed amount of stored energy when
10     it's cocked, and when I release that by either pulling
11     the trigger and allowing the clasp to move out of the
12     way or the string separating in half, the energy level
13     doesn't change.  At the very immediate instance when
14     that release occurs either by movement of the clasp or
15     separation of the bow string is 100 percent identical.
16 Q.  Now, in the -- I know you don't want to answer questions
17     about Cordy, but in the Cordy case you had to use like
18     artificial fingers for testing; correct?
19 A.  I did.
20 Q.  Did you try to do that in this case to see whether a bow
21     string remnant could cut through a finger?
22 A.  We already sort of know that there's enough energy
23     available to do that damage.  It's been demonstrated,
24     it's been demonstrated in Mr. Cordy's accident.  His
25     hand was in the path of the bow string in the unsafe

## Page 112

1      zone and when it contacted it's capable of amputating
2      fingers, and the instructions basically tell the user
3      that.
4  Q.  But you haven't done that testing where the bow string
5      is sliced first leading to the discharge?
6  A.  No.  Again, you know, I'm looking at the physical
7      evidence that remains, some of which has been discarded,
8      and the physical evidence that remains is consistent
9      with the scenario that I'm talking about in every
10     respect.
11 Q.  And do you know who discarded the bow string?
12 A.  No, I don't.  I mean, Mr. Miles has literally everything
13     except that bow string.  He's got the two cables, he's
14     got the two stops, he's got the packaging from
15     the parts that were used for the replacement.  It's a
16     complete mystery to me why he wouldn't have the bow
17     string as well.
18 Q.  Well, the cables were still intact; correct?
19 A.  Yeah.  No one in their right mind would ever reuse
20     those.
21 Q.  Now, you state in your report on page 31 that, looking
22     at the top, the tail end of a sentence, that basically
23     --
24         MR. SUTTON:  I'm sorry, which page are you on?
25         MR. MONACO:  Page 31.

## Page 113

1  A.  The sentence that spans 30-31.
2         MR. MONACO:  Correct.
3  BY MR. MONACO:
4  Q.  If you look at 30 and 31, the sentence begins on 30, it
5      says:  Based on Mr. Miles' testimony and the function of
6      the crossbow trigger mechanism it is more likely than
7      not that the separation of the bow string cutting or
8      other mechanical damage was the cause of Mr. Miles'
9      incident.
10         What other mechanical damage could have caused
11     Mr. Miles' incident?
12 A.  Mr. Miles, when you read his testimony, has owned a
13     number of crossbows and he's had string separations on
14     those crossbows as well.  I've been testing crossbows
15     for 17 years doing some pretty extreme things to them
16     and I have never had a string separate.  So the
17     implication from the testimony is that some practice on
18     the part of Mr. Miles does damage to the strings in the
19     way that he uses crossbows, not only the Ravin but his
20     Barnett bow.  He's said he's had two separations on
21     other crossbows.  Again, that's an atypical situation.
22         (A short recess was taken)
23 BY MR. MONACO:
24 Q.  Have you ever received any documentation such as an
25     email or memo, even a text that states that redesigns

1  started in July of 2017 were because of the fire nock
2  issues?
3  A.  I think there's testimony along those lines.  It's also
4  consistent with the what I would call prototype
5  drawings, a revision of the drawing.  It's never just a
6  one, it's a process.  And I think that was all in that
7  time frame.  Primarily the testimony.
8  Q.  So the answer is that you haven't received any emails or
9  memos or texts or anything saying that the redesigns
10  were initiated because of the fire nock issues?
11  A.  Let me --
12        MR. SUTTON:  Object.
13  A.  -- give you a slightly cagey answer.
14  BY MR. MONACO:
15  Q.  Sure.
16  A.  I've gotten 15,000 pages of documents in some of these
17  cases and I'm going to tell you right now you don't
18  recall every page.
19  Q.  That's fine.
20  A.  My impression as we sit here is it does relate to the
21  fire nock issue and the primary basis is that I think
22  that's really what was testified to.
23  Q.  In the process of redesigning some of the parts to the
24  trigger mechanism that's being done, do you know if
25  Ravin tested the redesigned parts using fire nocks, the

1  white nocks or the orange nocks?
2  A.  I can't point you to a document that says that.  I know
3  that there was testing associated with those redesigned
4  parts and I think there was even testing -- additional
5  design and testing.  But specifically what those tests
6  were, how they were executed, I don't -- I can't tell
7  you as I sit here.
8  Q.  On page 40 of your report up at the top in the middle it
9  starts off:  The combination of an extremely rare
10  intermediate nocking issue followed by an additional
11  misuse of the product does not mean that the product is
12  defective or unreasonably dangerous nor does it place a
13  user at unnecessary risk of serious injury.  The Ravin
14  R15 crossbow was not defective or unreasonably dangerous
15  when utilized in the intended manner.
16        When I read this I get the impression that you
17  accept a certain amount of risk even though it can lead
18  to bodily injuries.
19        MR. SUTTON:  Objection to form.
20  A.  And I think, I don't know, I accept it, I think we all
21  accept it.  You know, if I elect to -- for instance -
22  I'll use a non-crossbow example.  If I elect to fire a
23  gun, there's a lot of stuff that happens in there that's
24  dangerous, inherently.  I accept the risk when I go to
25  shoot that gun, full well knowing that there's a

1  combustion that takes place, there's a projectile that
2  moves out of the front of that gun at a rapid speed and
3  bad things can happen when I do that.  So I think
4  everybody who uses any sort of a product that's got a
5  component of risk associated with it has to accept that
6  risk to use the product.
7  BY MR. MONACO:
8  Q.  But you would agree that if there's an alternate design
9  that can eliminate the risk and if that implementation
10  of that design can be done in a cost-effective manner
11  that it should be done?
12        MR. SUTTON:  Objection to form.
13  A.  Right, but going back to the example I just gave, and it
14  applies to crossbows as well, these are energetic
15  weapons that energy cannot be designed out of the weapon
16  and, therefore, there will always be some degree of
17  risk.
18  BY MR. MONACO:
19  Q.  But if a specific risk can be eliminated in a reasonable
20  manner without diminishing the function of the product,
21  you agree that it should be eliminated?
22        MR. SUTTON:  Objection to form.
23  A.  I mean, I think the risk you might be alluding to is
24  this partial discharge situation and that was, in fact,
25  addressed in the original design and instructions.  The

1  user is instructed that if you pull the trigger, the bow
2  doesn't discharge, the very first action you're supposed
3  to execute was put it back on safe.  If you put it back
4  on safe nothing else could happen.
5  BY MR. MONACO:
6  Q.  But the redesign would not even get you to that step;
7  correct?
8  A.  I'm pretty sure the instructions still tell you to put
9  it back on safe.  Then you would go back to the same
10  place you would be with the original product.  So --
11  yeah, I don't know if that's a complete answer to your
12  question.
13  Q.  But there are steps in the process; correct?  Meaning
14  you have to load the arrow in the intermediate position
15  which then moves the ADF into a certain position, and we
16  could go down the line; correct?
17        MR. SUTTON:  Objection to form.
18  BY MR. MONACO:
19  Q.  Until you have the misfire; correct?
20  A.  We can go down a series of misuses that ultimately get
21  you to that potential situation.
22  Q.  And, so, if you could prevent the initial event, the
23  intermediate nocking of an arrow in a reasonable manner
24  and a cost-effective manner that will not diminish the
25  usefulness of the crossbow, you agree that should be

## Page 118

1  done?
2      MR. SUTTON: Objection; form.
3  A. First off, it sounds like a legal question which I'm
4      surprised it's not something he said. But it -- I'm
5      just not following the question.
6  BY MR. MONACO:
7  Q. I'll ask it again.
8  A. Yeah.
9  Q. There are steps along the path of getting to this
10     re-nocking discharge; correct?
11 A. Yes, there's steps that must be followed to use the
12     product correctly and there are steps that you skip, if
13     you will, that get you to the situation that we're
14     talking about in other cases.
15 Q. But the initial step is that the crossbow has to be
16     loaded with an arrow in the intermediate position;
17     correct? That's the first step --
18     MR. SUTTON: Objection to form.
19 BY MR. MONACO:
20 Q. -- of all this process?
21 A. Yes. The arrow, the first step, step Number 1, misuse
22     Number 1 is not properly nocking the arrow resulting it
23     being in some condition other than fully nocked.
24 Q. In the intermediate position; correct?
25 A. Correct, leading to what we ultimately determined is the

## Page 119

1  intermediate position.
2  Q. Correct. And you agree that if there is a simple design
3      change that can be done in a cost-effective manner and
4      in a manner that does not diminish the utility of the
5      crossbow that can eliminate this intermediate placement
6      of the arrow that that should be done?
7      MR. SUTTON: Objection to form.
8  A. I don't think it's as simple as you're characterizing it
9      here, because when we're talking about the product, as I
10     see it, it's not only the physical thing, meaning the
11     crossbow and the arrow, it's the intent of how it's
12     supposed to be used which is covered in the
13     instructions. And when I take that whole situation
14     there, that whole thing that I consider the product, the
15     instructions and the physical thing, it's already
16     addressed the scenario that you're describing. So why
17     do I have to then take another step and change it to
18     address that. It's already addressed.
19 BY MR. MONACO:
20 Q. Well, you believe in the hierarchy that goes design,
21     guard, warning?
22 A. I'm familiar with that, yes.
23 Q. So the first step is to try to eliminate a risk by
24     design?
25 A. It is.

## Page 120

1  Q. So in my question if you can eliminate a risk by design,
2      which is the first item in the hierarchy, and if you
3      could do it in a reasonably cost-effective manner and in
4      a manner that does not diminish the utility of the
5      product, that should be implemented?
6      MR. SUTTON: Asked and answered couple times.
7  A. But it's already inherent. Specific situation is
8      unrelated to Mr. Miles but is related to some of the
9      other cases has already been addressed. The user pulled
10     the trigger, the arrow didn't discharge which is what it
11     was supposed to do, which would have been a dry fire of
12     the bow, and then all you have to do is put it on back
13     on safe and you're back in a place where nothing bad
14     happens.
15 BY MR. MONACO:
16 Q. But that's not what I'm asking. I'm not asking you to
17     do a comparison. What I'm asking is -- let me ask you
18     this. So it's your opinion that you shouldn't implement
19     a design change that can eliminate a risk in a
20     cost-effective manner and in a way that will not
21     diminish the utility of the product?
22 A. I view this case, which is why I expressed the opinion
23     in the manner that I did, this white nock issue, I don't
24     view this as a defect. The user is given explicit
25     instructions to nock that thing fully and if it's nocked

## Page 121

1  fully this situation cannot develop. And I don't think
2      it's foreseeable if people are going to nock it partway
3      because it's distinct. The force feedback you have in
4      your hand, that audible feedback you get and the visual
5      feedback that you can see are all plain and easy to
6      understand and easy to accomplish.
7  Q. Well, the redesign of the parts it was something that
8      was easy to accomplish as well, it only took a couple
9      months, and those three redesigns could have been
10     implemented when these crossbows were first put into
11     production?
12     MR. SUTTON: Objection to form. It assumes
13     facts not in evidence.
14 A. The redesign I wouldn't characterize as trivial.
15 BY MR. MONACO:
16 Q. I didn't say it was trivial, I said it took a few
17     months.
18 A. But the implication the way that you said it at least in
19     the tone and inflection that you were using it was a
20     simple process, which is never going to be conveyed in
21     the record.
22     MR. SUTTON: You said it took a couple of
23     months. Obviously it took more than that.
24 A. That's besides the point. I think the testimony from
25     Ravin was that they didn't view this as a defect either

1    but they saw a different approach to do this to try and,
2    you know, address this scenario. So they issued a
3    recall to the broadest audience possible to change some
4    parts to make this an even more difficult situation to
5    get into, not a defect because it was addressed in the
6    very initial design of the product.
7    BY MR. MONACO:
8    Q.  Do the redesign changes eliminate the ability to place
9        the arrow in an intermediate position which then leads
10       to a -- which then leads to the ADF preventing a
11       discharge?
12              MR. SUTTON: Objection; form.
13   A.  Those components aren't involved in this case and I
14       don't have a case that they are yet. Although if a
15       second orange nock comes I will get the opportunity to
16       dive into the weeds and look at that one.
17              So the short answer is I haven't done the
18       analysis. I think Mr. Yehle's testimony was
19       possibility, although my read of the testimony being an
20       engineer was it was a classic engineering answer to a
21       question without understanding of that answer in the
22       context of litigation. In other words -- and this a
23       little intended to be in tongue in cheek -- most
24       engineers if you ask monkeys if they could fly out of
25       your butt would probably give you possibly, although in

1    the back of their mind they think probably never. But
2    an answer from an engineer sometimes isn't as crisp and
3    clean as it's used in the legal context.
4    BY MR. MONACO:
5    Q.  I'm not even -- let me ask it -- strike that. Let me
6        ask in a more general sense.
7               If there's a feasible design that will
8        eliminate a risk without being cost prohibitive and
9        without diminishing the utility of the product should
10       that design be used?
11              MR. SUTTON: Objection to form. We're getting
12       pretty far afield. I don't think that has anything to
13       do with this particular case.
14              MR. MONACO: It has everything to do with the
15       case.
16              MR. SUTTON: I completely disagree. But go
17       ahead. You can ask him again. This is the sixth time,
18       Jack. This is the last time he's going to answer this.
19              You can tell him the same thing you told him
20       before.
21              THE WITNESS: Can I ask you to read the
22       question back, please.
23       (Record repeated as requested)
24   A.  Again, the context of this case --
25   BY MR. MONACO:

1    Q.  I'm not asking in the context of this case. I'm asking
2        in general.
3               MR. SUTTON: You've asked the same question
4        and, again, he's going to give his response. Don't cut
5        him off, please. Let him respond.
6    A.  Again, I'm here to answer questions in the context of
7        this case. I think that's why I was noticed, in the
8        Miles vs. Ravin case.
9    BY MR. MONACO:
10   Q.  I'm allowed to ask for your general --
11              MR. SUTTON: Please allows him to answer.
12   BY MR. MONACO:
13   Q.  Go ahead.
14   A.  In the context of this case there was no issue to begin
15       with although the company did elect to make design
16       changes. In the most general sense, yeah, I mean you
17       can redesign the product but, again, it's got nothing to
18       do with this case and the circumstances surrounding this
19       product.
20              MR. MONACO: Do you have anything, Tim? Tim?
21              MR. MULLIN: No, I don't have anything.
22              MR. MONACO: Give me one second.
23              MR. SUTTON: Sure.
24              MR. MONACO: Let's go off the record and look
25       at my notes and I think we're done.

1        (A short recess was taken)
2    BY MR. MONACO:
3    Q.  So it's my understanding, Mr. Saunders, that back in
4        2017 that Beacon had tested some Ravin crossbows;
5        correct?
6    A.  Yes.
7    Q.  And do you know why Beacon was asked to do the testing
8        back in 2017?
9    A.  The way it was presented to us is that we were told we
10       were being sent to population 20 crossbows that had been
11       returned from customers and that we were asked to
12       evaluate those crossbows with regard to instructions for
13       the crossbow; and beyond that didn't have any insight
14       into what was going on.
15              Now, obviously, in hindsight --
16   Q.  Sure.
17   A.  -- and I don't have a bench bar perspective, but at that
18       time it was as simple as what the report says. So I was
19       provided 20 crossbows, I was asked to do testing on them
20       relative to the instructions that came with them and I
21       was asked if the instructions were statistically
22       significant.
23   Q.  So you weren't told whose crossbows they originally
24       were?
25   A.  Not explicitly. Some of the boxes had writing on them,

1   they may have had names. I didn't keep a record of that
2   and ultimately they were returned to Ravin when it was
3   done, and they were all tracked by serial number.
4   Q. Sure. So, the 20 crossbows, they were shipped to your
5   office in Maryland?
6   A. Yes.
7   Q. And who did the actual testing?
8   A. The setup, in other words how we were going to do the
9   testing was me and then I had the technician do the
10  work. His name was Tony Arends, A-R-E-N-D-S.
11  Q. What was Mr. Arends' role?
12  A. He's a -- he's actually I would consider him a personal
13  friend. That's how I know him.
14  Q. Sure.
15  A. I knew him through sailing. He was someone who worked
16  as a sail maker and didn't seem to have -- it was
17  consistent enough for him but it would have driven me
18  nuts but he didn't have consistent work, and, so, any
19  time I thought there was something that he had a skill
20  set he could help me which I would bring him in to do
21  serve that role as a technician, if you will.
22  Q. Did he have any background in hunting? Meaning was he a
23  hunter? Did he ever shoot a crossbow before or anything
24  like that?
25  A. No. The first time he shot a crossbow was the Ravin

1   crossbow during this testing.
2   Q. And before he started the testing your report indicates
3   that he familiarized himself with the written
4   instructions?
5   A. Yes. What happened was I gave him a set of instructions
6   to review and then I did a demonstration for him, I
7   think more than one, to the point that the combination
8   of him reviewing the instructions, him being present
9   with the physical crossbow and him watching my
10  demonstration to him he felt comfortable proceeding with
11  the test.
12  Q. Now, it's my understanding that the first time he tried
13  to fire one of the crossbows there was a hang fire?
14  A. No.
15          MR. SUTTON: Objection; form.
16  A. Well, it's not explicitly laid out. He tried to fire
17  the crossbow and the ADF functioned normally. So, in
18  other words, he tried to shoot it, didn't go off with
19  the trigger pull. He followed the instruction, put it
20  back on safe, reloaded the arrow now properly and the
21  bow functioned normally for the remainder of the
22  testing.
23  BY MR. MONACO:
24  Q. Do you know during that first shot when he was loading
25  the crossbow whether the arrow was placed in the

1   intermediate position?
2   A. No.
3   Q. You don't know?
4   A. No, there's no way to tell that. It's either normal
5   function of the ADF or the intermediate position, but he
6   was instructed to follow the instructions and then it
7   moved it to safe and moved on with the testing.
8   Q. What do you call that when the ADF works and prevents a
9   fire?
10  A. ADF. Anti-dry fire.
11  Q. What do you call that event?
12  A. It's -- that's what I would call it. The mechanism is
13  called an ADF mechanism, and it's --
14  Q. So you just say ADF event?
15  A. Correct. It functioned, it prevents the trigger from
16  moving and when you release the trigger force the thing
17  resets itself.
18  Q. Sure. You would agree, though, that that ADF event was
19  because the arrow was not loaded properly?
20  A. Correct. And the bow did what it was supposed to do and
21  that is prevent the bow from firing to prevent that dry
22  fire event from occurring.
23  Q. So do you think he then misused the crossbow during that
24  first shot?
25  A. Yeah. I mean by definition he didn't fully click the

1   arrow onto the string, but in the end he followed the
2   instructions and put the thing back on safe and it was
3   inconsequential, which is what the case would be if
4   users would put it back on safe as they're instructed or
5   for that matter nock it fully to begin with.
6   Q. How do you explain the various users testifying or
7   providing information or even that they believed that
8   they had put the safety back on?
9           MR. SUTTON: Objection to form.
10  A. Sometimes in the context of the questioning that's the
11  only answer they can give because if they admitted they
12  didn't put it back on safe their particular claim or
13  lawsuit may not move forward.
14  BY MR. MONACO:
15  Q. I'm talking about people that -- well, my question did
16  include people that were injured that have a claim but
17  it also included people who weren't injured so they
18  don't have an agenda. How do you explain -- I'll ask
19  the question again. How do you explain the individuals
20  who weren't hurt when they state that they believe they
21  put the safety back on?
22  A. That may be a perception but it didn't happen. If the
23  bow discharged it can't be in safe. It's a physical
24  impossibility. If that bow is in safe, white dot is
25  fully showing in the window, no way no how with that

1    clasp moved would that bow discharge. It's a physical
2    impossibility.
3  Q.  But if the white dot is only partially showing there
4    could have been a discharge?
5  A.  Right, but if the white dot is partially showing they
6    haven't followed the instructions and they haven't put
7    it back into safe.
8  Q.  I didn't ask you that. I just said if only a portion of
9    the white dot is showing there could be a discharge?
10  A.  Again, you got to go back to the sequence of what
11    they're instructed to do. If they have not follow
12    that sequence there could be a discharge.
13  Q.  Let me ask you this. How much of the white dot --
14    strike that.
15        What percentage of the white dot can be shown
16    and still have a discharge?
17  A.  It's not --
18        MR. SUTTON: Object to form.
19  A.  -- something I've analyzed.
20  BY MR. MONACO:
21  Q.  So you can't say whether it's 9 percent of the white dot
22    or 60 percent, you just haven't done the analysis?
23  A.  No. I mean, it's not -- a condition like that basically
24    isn't worth, and I don't mean to diminish your question
25    but it's not worth the time and effort to determine

1    because it's not something that's supposed to be done.
2    It's either on or off. And when it's on the white dot
3    is fully shown in the window. So, no, I haven't gone
4    back to look at the infinite number of possibilities
5    that exist and relate it back to a percentage of
6    visibility of the white dot.
7  Q.  Let me ask you this. Sometimes, and for lack of a
8    better description, switches or dials have what may feel
9    like a, like a groove. So I have a dial and I turn it
10    maybe like it clicks, I feel it click in one spot and it
11    kind of has like different placements. Do you
12    understand --
13  A.  I do.
14  Q.  -- what I'm trying to get at?
15        Let me ask you this. In regards to the safety
16    on these Ravin crossbows could they have been designed
17    that there are these grooves, there's a groove that
18    would force it fully in this safe position or fully in
19    the fire position?
20  A.  If I told you they did would you believe me?
21  Q.  Does it work? Go ahead.
22  A.  So if we look at -- let me use one we've already marked.
23  Q.  Sure.
24  A.  So what we're looking at is what's been marked as
25    Exhibit 2. I'm just going to circle an area in blue

1    pen, the subject of the coming answer. So what we're
2    looking at here is the interaction between the detent
3    ball -- and, by the way, that groove, if you said the
4    word detent to an engineer he would be on the same page
5    as you.
6  Q.  Very good.
7  A.  There's a Delrin ball which is illustrated as a black
8    circle on Exhibit 2 that sits in a conformal notch on
9    the front of the safety and the safety, the physical
10    thing that's a safety is the green component on Exhibit
11    2. And, so, if I were to take this area and draw a
12    blowup -- and I'm not necessarily an artist -- and you
13    look closely in there what you're going to see is a
14    little radiused notch and that radiused notch matches
15    the ball. So that's ball --
16  Q.  Um-hmm.
17  A.  -- and safety.
18  Q.  Sure.
19  A.  And, so, those two engage one another when you're in the
20    fire position.
21  Q.  Okay.
22  A.  And, so, when you're moving this thing to safe what
23    you're doing is you're progressively building up a force
24    until such time as you can move that ball up and out of
25    that socket and onto the top surface. And that moment

1    when you cross where the ball is on the top surface is
2    your peak force and then it's just going to fall into
3    safe, if that makes sense, because my peak force is
4    getting the ball up and out. Once the ball is up and
5    out I'm at my peak force and it's going to slam into
6    safety, if you will.
7  Q.  But they could have designed it with two balls, with two
8    balls, a ball for the fire position and a ball for the
9    safe position?
10  A.  But the second ball for the safe position wouldn't do
11    you any good because there's a bias spring in here
12    that's constantly pushing it toward the safe position.
13    So the detent holds it in the fire position and once
14    you're out of the fire position it's forced into the
15    safe position by the spring on the safety.
16  Q.  Unless the sear had moved a bit then; correct?
17  A.  The -- again, the testing that's been done just last
18    week with Dr. Batzer, and don't quote me on the numbers
19    because I don't recall them precisely, it's called
20    3.9 pounds was required to actuate the safety from safe
21    -- from fire to safe in a, quote-unquote, normal
22    condition and in a condition that Dr. Batzer set up when
23    she was determining the intermediate position it was
24    also 3.9 pounds approximately to move it from fire to
25    safe with the sear, with that interaction with the sear

Page 134

1 that you just alluded to. So there's no difference in
2 force.
3 Q. But you agree, though, that the safety can wind up in an
4 intermediate position?
5 A. If I just barely and carefully move this ball out of
6 here, in other words I'm very precisely trying to make
7 that happen --
8 MR. SUTTON: Objection; form.
9 A. -- possibly. But if I'm just moving this thing from
10 safe to fire in a normal way, no way possible.
11 BY MR. MONACO:
12 Q. Would you agree that Mr. Miles before his incident was
13 not aware that there was such a thing as an intermediate
14 positioning of the arrow?
15 A. I can't -- I can't tell you what he knew or didn't know
16 before the accident beyond what he's already testified
17 to, and I'm not sure he was asked that specific
18 question.
19 Q. Does the manual address the intermediate positioning of
20 the arrow?
21 A. Yes.
22 Q. In which ways?
23 A. It says basically if you pull the trigger and the bow
24 does not discharge before you do anything else you put
25 it back on safe. If you did that sequence as you're

Page 135

1 instructed, from the user's perspective the intermediate
2 position is transparent, you'll never know anything
3 different happened.
4 Q. Does the manual address what type of targets should be
5 used?
6 A. I'd to have go review it, but it's -- even if it doesn't
7 address it, it's well-known that the target needs to be
8 matched to the weapon that you're using. In other
9 words, if I use, to use an extreme example just to
10 illustrate the point, if I took a high-powered rifle and
11 shot it at a block target intended for an arrow I think
12 we would all accept it. It's probably not going to do
13 anything. Similar concept exists for vertical bows and
14 crossbows. The targets need to be matched to the weapon
15 that's being used.
16 MR. MONACO: That's all I have. I am
17 finished.
18 MR. SUTTON: Mr. Mullin, anything?
19 MR. MULLIN: Nothing from me, no.
20 MR. SUTTON: Okay. You have the right to read
21 and sign which we will exercise and the dep is
22 concluded. Thank you.
23 MR. MULLIN: I'd like an e-transcript, please.
24 THE COURT REPORTER: With copies of the
25 exhibits?

Page 136

1 MR. MULLIN: I'm sorry, I didn't hear that.
2 MR. MONACO: And copies of the exhibits?
3 MR. MULLIN: Yes.
4 (The Deposition concluded at 12:32 p.m.)

Page 137

1 CERTIFICATE OF NOTARY
2
3 STATE OF MICHIGAN )
4 ) SS
5 COUNTY OF OAKLAND )
6
7 I, Cynthia Ann Chyla, Certified Shorthand
8 Reporter, a Notary Public in and for the above county
9 and state, do hereby certify that the above deposition
10 was taken before me at the time and place hereinbefore
11 set forth; that the witness was by me first duly sworn
12 to testify to the truth, and nothing but the truth, that
13 the foregoing questions asked and answers made by the
14 witness were duly recorded by me stenographically and
15 reduced to computer transcription; that this is a true,
16 full and correct transcript of my stenographic notes so
17 taken; and that I am not related to, nor of counsel to
18 either party nor interested in the event of this cause.
19
20
21 _____
22 Cynthia Ann Chyla, CSR-0092
23 Notary Public,
24 Oakland County, Michigan
25 My Commission expires: 05-12-2023

35 (Pages 134 to 137)